# IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| Smoot Construction Company of Washington, D.C., | : | |
| | : | CASE NO.:  2:22-cv-1707 |
| Plaintiff, | : | |
| | : | JUDGE MICHAEL H. WATSON |
| vs. | : | |
| | : | MAGISTRATE CHELSEY M. VASCURA |
| The Smoot Corporation, et al., | : | |
| | : | |
| Defendants. | | |

## DEFENDANTS THE SMOOT CORPORATION AND THE SMOOT CONSTRUCTION COMPANY OF OHIO'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION[1]

Pursuant to Federal Rule of Civil Procedure 65, the Court's general equitable power and the law upon which this action is brought, and for the reasons set forth in the attached Memorandum, Defendants move for a Temporary Restraining Order and a Preliminary Injunction requiring Plaintiff, and those acting in concert with it, to immediately:

1.  Cease using the "Smoot" name in connection with any business, marketing, construction, building, or general contracting purposes.

2.  Cease using the domain name smootconsructiondc.com and remove all current content displayed on that website from public access.

3.  Return control of the domain name smootconsructiondc.com to The Smoot Corporation.

4.  Cease using The Smoot Corporation's Registered Marks, trade name, or trade dress in any fashion. (*See* Verified Complaint Ex. C; E).

---

[1] The Smoot Construction Company of Ohio is a wholly owned subsidiary of The Smoot Corporation and has a permissive license on the Smoot trade name and the Registered Marks referenced herein. These claims, and this TRO, are brought jointly, to the extent that the Smoot Construction Company of Ohio is independently harmed by the uses and unfair practices described herein.

5.     Cease the circulation of photos, video and media containing any depiction of or reference to: The Smoot Corporation, its founders, employees, former employees, corporate history, and projects completed by The Smoot Corporation.

6.     Cease using The Smoot Corporation's proprietary bidding software.

7.     Cease making false claims and misleading statements about Plaintiff's own corporate history and make-up, experience in the construction trades and related industries, and geographical regions in which it operates.

A Memorandum in Support and Proposed Order are attached hereto.

Respectfully submitted,

*s/Patrick Kasson*
Patrick Kasson (0055570)
Thomas N. Spyker (0098075)
Eric J. Weiss (0073066)
**Reminger Co., L.P.A.**
200 Civic Center Dr., Suite 800
Columbus, Ohio 43215
TEL No.: (614) 228-1311
FAX No.: (614) 232-2410
pkasson@reminger.com
tspyker@reminger.com
*Counsel for Defendants The Smoot Corporation and The Smoot Construction Company of Ohio*

2

## MEMORANDUM IN SUPPORT

[2]



**Smoot Construction**

Smoot Construction is a national strategic partner to the Balfour Beatty organization. A minority-owned general contractor and in the third generation of family leadership since 1965, Smoot Construction has helped shape urban skylines in a number of key residential markets.

Smoot's experience features rental, multifamily apartments and affordable housing units, a high-rise student housing structure, and some of the most luxurious condominium communities in the nation. They have completed over $440 million in student residences.

Balfour Beatty and Smoot Constructions completed the Entrepreneurship Living-Learning Center (Bowie State University) and Aspire at Discovery Park (Purdue University) together.

This project will be served by the Washington, DC office, who partnered with Balfour Beatty Construction on a large multifamily project downtown.

**MARK CAIN**
President

**OMAR MCINTOSH**
Regional Executive/Senior Vice President

› 3rd generation family-led

› Minority-owned

› Genuine builders

Anyone reading the above would naturally think The Smoot Corporation—*a third generation family-led construction company which has a registered trademark on the depicted orange logo*—submitted these construction proposals. But not so. The Smoot Corporation is not involved in either project. Instead, these are proposals submitted by Plaintiff, utilizing The Smoot Corporation's Registered Trademarks, without its knowledge and consent. And this is just the tip of the iceberg.

For over thirty years, Plaintiff operated as a permissive licensee of the trade name and relevant marks under The Smoot Corporation. This was done under The Smoot Corporation's "One Company" philosophy, which was embraced by Plaintiff's President, when he was The Smoot Corporation's President. In essence, Plaintiff and the other regional "Smoot" companies were all operated for the benefit of "One Company," with supervision for all companies performed by The Smoot Corporation and its officers. But within the last year, Plaintiff has broken with the

---

[2] Plaintiff's Construction Bid Proposals, Verified Complaint Exhibits L and M.

"One Company" philosophy – which Plaintiff's President and CEO, Mark Cain had previously embraced – seeking to compete with the other "Smoot" companies. And Plaintiff is using the trade name and relevant marks to compete. Any license to use the name and marks has thus been cancelled by Plaintiff's abandonment of the "One Company" approach and other actions.

Plaintiff's intent is clear—it wants to become "Smoot Construction" without having any right to that name. To be sure, the Court need not look further than Plaintiff's Complaint. There, Plaintiff identifies itself as "Smoot Construction" while identifying The Smoot Corporation—the owner of that mark—as "S. Corporation." (*See* Complaint, Doc. #1 at PageID: 1).

The evidence is damning. From wholesale duplication of The Smoot Corporation's website, to depicting employees wearing The Smoot Corporation's logo on Plaintiff's website, through advertising materials, project bids and interviews with the press, Plaintiff is attempting to morph itself from The Smoot Construction of **D.C.** to "Smoot Construction." And that is against the law. *In fact, it is against the law for Plaintiff to use the word "Smoot" in any fashion relating to the construction business.* Because it is well established that this conduct creates irreparable harm, Defendants seek a temporary restraining order and preliminary injunction to stop Plaintiff's illegal conduct.

## I.     FACTUAL BACKGROUND

### A.     The Smoot Corporation is a third-generation, minority owned and family-led construction company operated under a "One Company" philosophy.

The Smoot Corporation is a construction company founded by Sherman Smoot in 1946. (Verified Complaint, ¶ 1). The Smoot Corporation is now in its third generation of family leadership under President, CEO, and Chairman of the Board, Lewis R. Smoot, Jr. (*Id*. at ¶ 5). The Smoot Corporation is entirely family owned and its shareholders include Plaintiff's President and CEO, Mark Cain.  (*Id*. at ¶ 10).

4

Despite having operations in D.C. and Indianapolis, The Smoot Corporation has always adhered to a "One Company" philosophy, which was originally driven by Lewis Smoot, Sr. (*Id.* at 51-52). The basis for this philosophy is that all "Smoot" entities would operate for the benefit of the entire company, not just each related entity, including its D.C. operations. (*Id.*).

**B.** **Mark Cain, Plaintiff's President, embraced and continued Lewis Smoot, Sr.'s "One Company" philosophy during his tenure as The Smoot Corporation's President.**

Mr. Cain, Plaintiff's current President, continued the "One Company" philosophy when he became The Smoot Corporation's President in 2010. In fact, when memorializing the company's structure, Mr. Cain drafted a corporate organizational chart that began with the words "One Company." (Verified Complaint, Ex. I). Mr. Cain listed the Plaintiff's operations in D.C., despite being a separate entity, under The Smoot Corporation. (*Id.*). And Mr. Cain, in describing his own role as The Smoot Corporation President, as having responsibility to oversee Plaintiff's D.C. operations. (*Id.*).

**C.** **The Smoot Corporation began operations in Washington D.C. in 1964.**

Around 1964, under the leadership of Lewis R. Smoot, Sr., The Smoot Corporation began working in the D.C. and greater capital region. (Verified Complaint, ¶ 29). From 1964 until 1984, Smoot's D.C. operations were run directly by The Smoot Corporation. (Verified Complaint, ¶ 30). In 1984, Plaintiff, "The Smoot Construction Company of D.C.", was founded as a wholly owned subsidiary of The Smoot Corporation. (Verified Complaint, ¶ 30).

**D.** **In 2005, due to financial struggles of the D.C. operation, it was reorganized from a wholly owned subsidiary of The Smoot Corporation into an individually held company.**

In 2005, the Directors of The Smoot Corporation, in consultation with Plaintiff's then officers, including Mark Cain, determined Plaintiff needed reorganizing due to prolonged financial

struggles of the D.C. operation.  (Verified Complaint, ¶ 30).  Specifically, to take advantage of supplier incentives to reduce operational overhead, Mark Cain advised the Board that Plaintiff should be reorganized from a wholly owned subsidiary to an individually owned operation— owned by a D.C. resident.  (Verified Complaint, ¶ 35).

Mark Cain, a Smoot family member, an officer of The Smoot Corporation, and a shareholder of The Smoot Corporation was the choice to take majority ownership.  (Verified Complaint, ¶ 36).  Thus, in May of 2005, The Smoot Corporation Board of Directors authorized the sale of Plaintiff to the shareholders of The Smoot Corporation.  (Verified Complaint, ¶ 37).  Subsequently, a 51% ownership interest was transferred to Mark Cain via a stock purchase agreement.  (Verified Complaint, ¶ 38; *see also*, relevant Board Minutes, Exhibit H to the Verified Complaint).

### E. From 2005 until 2021, Plaintiff was operated in alignment and for the benefit of The Smoot Corporation with its use of the relevant marks closely monitored.

The intent of reorganizing Plaintiff from a wholly owned subsidiary into an individually owned entity was to take advantage of economic incentives avalible to a locally owned corporation.  (Verified Complaint, ¶ 35).  However, in vesting the majority ownership in a family member and shareholder of The Smoot Corporation, it was intended that Plaintiff would be operated in a manner to benefit The Smoot Corporation and the common shareholders between Plaintiff and The Smoot Corporation.  (*See* Verified Complaint, ¶¶ 43-51).  Further, it was understood that The Smoot Corporation would exercise substantial control over Plaintiff's use of the Smoot trade name and its marks via common shareholders, directors, and the general oversight of Plaintiff's operations by The Smoot Corporation.  (Verified Complaint, ¶ 35).

And for sixteen years after the reorganization, this is how Plaintiff was operated, and The Smoot Corporation maintained control and oversight over the use of its trade name and the relevant

marks. From 2005-2010, Plaintiff's President and CEO regularly reported to The Smoot Corporation's Board about the state of Plaintiff's operations, its finances, and projections. (Verified Complaint, ¶ 76).

In addition to the oversight of the Board, The Smoot Corporation installed several other controls to assure that the Smoot name and the Registered Marks were used for the benefit of The Smoot Corporation and that the quality of the brand would not be compromised. (Verified Complaint, ¶¶ 58-69). For example, The Smoot Corporation provided: comprehensive accounting and financial services; estimating and bidding services for construction projects; worksite safety and oversight; webhosting and design; marketing and publicity; and financial oversight and support. (Verified Complaint, ¶ 73). This was beyond the services contemplated in the Administrative Services Agreement, which only covered "administrative support services." (*See* Exhibit A to the Verified Counterclaim).

### F. From 2010 until 2021, The Smoot Corporation and Plaintiff were controlled by the same corporate president, Mark Cain.

From 2010 until 2020, Plaintiff's President and CEO Mark Cain was President of The Smoot Corporation. (Verified Complaint, ¶ 76). During this period, Mr. Cain ran the D.C. operations mostly from The Smoot Corporation's Columbus, Ohio location. (Verified Complaint, ¶ 78; *see also* exemplar emails, Exhibit G to the Verified Complaint). Thus, The Smoot Corporation exercised complete control over the use of its trade name and the relevant marks through the unified control under the leadership of Mark Cain. (*Id*).

On September 21, 2020, Mark Cain and Lewis R. Smoot, Jr. were elected as Co-Presidents of The Smoot Corporation. (Verified Complaint, ¶ 80). On or around July 30, 2021, it became clear that there was a lack of communication, collaboration, and teamwork. (Verified Complaint, ¶ 81).

So, on July 30, 2021, the Board determined it was in the best interest of The Smoot Corporation to elect Lewis R. Smoot, Jr. as Chairman of the Board, President, and CEO of The Smoot Corporation. (Verified Complaint, ¶ 82). On August 2, 2021, due to—among other reasons—his actions and/or inactions, Mark Cain was terminated as an employee of The Smoot Corporation. (*See* Verified Complaint, ¶¶ 99-108). On September 21, 2021, Mark Cain resigned as a Director from The Smoot Corporation. (Verified Complaint, ¶ 87).

### G. After Mark Cain was removed as President of The Smoot Corporation, Plaintiff continued to use the Smoot name and protected marks—but now in a direct effort to compete with The Smoot Corporation and confuse the Public.

Although Mr. Cain was dismissed from his roles with The Smoot Corporation, he retained his presidency of Plaintiff. (Verified Complaint, ¶ 84). After Mr. Cain's removal from The Smoot Corporation, Plaintiff began using the Smoot name and its protected marks in a manner exceeding its authority and for the purpose of entering into direct competition with The Smoot Corporation. For example:

- **Construction Proposals:** Plaintiff has submitted *at least* two construction proposals attempting to capitalize on the family history of The Smoot Corporation. (See Proposals, Exhibits L and M to the Verified Complaint). Both proposals bear the '888 Registration's protected design mark. (*Id*.).

- **Website Design:** Plaintiff's website contains repeated use of the Smoot name and use of the Registered Marks. This includes photos of former Smoot Corporation employees and express reference to The Smoot Corporation's family history:



KNOW **INTEGRITY.** KI

With more than five decades of growth and experience in general contracting, design-build, and construction management, Smoot Construction has created a legacy of excellence and a reputation for hard work and high standards in the National Capital region.

3

- **Media interviews:** In an interview given to the Columbus Dispatch, Plaintiff's President and CEO Mark Cain told the media outlet that he was bringing Plaintiff to Columbus to build on his grandfather's legacy—ignoring the fact that his grandfather's company, The Smoot Corporation, was still in active operation. (*See* Dispatch Article, Exhibit N to the Verified Complaint). Additionally, Plaintiff announced expansion into a new market which it had never previously operated, Boston, MA. (*Id.*).

The uses outlined above can only be viewed as a concerted effort to intentionally confuse the public. And the public has been confused as several of The Smoot Corporation's industry contacts have contacted the corporate officers about Plaintiff's announcements about expansion.

### H. Plaintiff endangers the Smoot name and reputation for integrity.

In addition to attempting to effectively steal the "Smoot Corporation" name and brand, Plaintiff has taken actions to threaten The Smoot Corporation's good name. Specifically, it appears that Plaintiff submitted a falsified application to the Capital Region Minority Supplier

---

[3]Available at https://smootconstructiondc.com/services/ (Last accessed 4/10/2022 at 10:30 a.m. EST)

Development Council for recertification of their minority owned status. (Verified Complaint, ¶¶ 97-111; *see also* Ex. J). In essence, it appears Plaintiff's employee has forged signatures. (*Id.*) But The Smoot Corporation has always been synonymous with integrity—its core principle. (Verified Complaint at ¶ 133). And conduct such as submitting a falsified application to The Capital Region Minority Supplier Development Council, under the Smoot trade name, damages the Smoot trade name and Registered Marks which are recognized nationally to convey trust and integrity. (Verified Complaint, ¶ 111).

## I. The Smoot Corporation's protected marks.

The Smoot Corporation is the owner of two registered trademarks relevant to this matter. (See Verified Complaint at ¶¶ 14-27). First, The Smoot Corporation is the owner of U.S. Registration Number 4,829,887 for the standard character mark "SMOOT" issued on October 13, 2015, for "Commercial Building General Contractor; Commercial Building Construction, in Class 37 (U.S. CLS. 100, 103 AND 106)" (Hereafter the "'887 Registration"). A true and accurate copy of the '887 Registration is attached to the Verified Complaint as Exhibit C.

Second, The Smoot Corporation is also the owner of U.S. Registration Number 4,829,888 for the design mark consisting of "two concentric squares surrounding the stylized lettering 'SRS', to the right of which is the text 'SMOOT', underlined, below which is the word 'CONSTRUCTION'" issued on October 13, 2015, for "Commercial Building General Contractor; Commercial Building Construction, in Class 37 (U.S. CLS. 100, 103 AND 106)" (Hereafter the '888 Registration"). The '888 Registration appears as such:



A true and accurate copy of the '888 Registration is attached to the Verified Complaint as Exhibit C.

**J. The registrations were directed by Plaintiff's President, Mark Cain, as President of The Smoot Corporation.**

It is important to note that registrations and marks were done under Mark Cain's leadership, as President of The Smoot Corporation. (Verified Complaint at ¶ 26). The general counsel specifically reported these actions to Mr. Cain—at his email address—in his capacity as The Smoot Corporation's President. (*Id.*). At no time during this process did Mr. Cain seek to establish any protection for The Smoot Corporation of D.C.'s use of the marks or the name. (*Id.*). And of course, when the falling out began and Mr. Cain began plotting to bring Plaintiff into competition with The Smoot Corporation, the first thing he did was ask the general counsel to send him copies of The Smoot Corporation's registrations. (*Id.*). Simply put, Plaintiff's President reviewed the registrations, in the summer of 2020, yet has proceeded with the illegal action, regardless of Mr. Cain's specific knowledge of the protections.

**II. LEGAL STANDARD**

**A. Grounds for granting a temporary restraining order.**

When ruling on a motion for a preliminary injunction, this Court must consider and balance four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *PACCAR Inc. v. TeleScan Technologies, L.L.C.*, 319 F.3d 243, 249 (6th Cir. 2003), citing, *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 753 (6th Cir. 1998). These four considerations are factors to be balanced, not prerequisites that must be met. *Frisch's Restaurant, Inc. v. Shoney's Inc.*, 759 F.2d 1261,

1263 (6th Cir. 1985), citing *In re DeLorean Motors Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985).

    **B.    Standard for relief under the Lanham Act.**

    In seeking relief under either Section 32 of Lanham Act (15 U.S.C. § 1114), pertaining to registered marks, or Section 43(a) of the Act (15 U.S.C. § 1125(a)), pertaining to unregistered or common-law marks, the touchstone test is whether the unauthorized use of the mark in question is likely to cause confusion among consumers as to the source, origin, or approval of the goods or services offered. 15 U.S.C. § 1114; 15 U.S.C. § 1125(a); *see also*, *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

    The Southern District has repeatedly recognized, in claims involving the Lanham Act, "a movant may merit preliminary injunctive relief simply upon a showing of irreparable harm and either a likelihood of success on the merits or 'sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Abercrombie & Fitch v. Fashion Shops of Ky., Inc.*, 363 F. Supp. 2d 952, 958-59 (S.D. Ohio 2005), citing *Worthington Foods, Inc. v. Kellogg Co.*, 732 F. Supp. 1417, 1428 (S.D. Ohio 1990).

## III.    LAW AND ARGUMENT

    **A.    The Defendants are likely to succeed on the merits because Plaintiff is using the Smoot trade name and Registered Marks with an intent to confuse the public.**

        **1.    The Smoot Corporation has valid and protectable marks.**

    There can be little debate. The Smoot Corporation has valid and protectable rights in the marks at issue. As to the '887 Registration of the character mark "Smoot", The Smoot Corporation owns the federal registration to this mark, issued in 2015—claiming nearly thirty years of commercial use. (*See* Ex. C). The same is true of the '888 design mark. (*See* Ex. E).

And certificate of federal registration serves as *prima facie* evidence that (a) the mark is valid, (b) the registration exists, (c) the registrant owns the mark in question, and (d) the registrant has the exclusive right to use the mark in connection with the services specified in the certificate. *See* 15 U.S.C. § 1057(b).

> ## 2. The Smoot Corporation has not consented to Plaintiff's current use of the relevant marks.

> ### i. Plaintiff's prior use of the relevant marks was subject to an implied license.

From 2005 until 2021, The Smoot Corporation allowed Plaintiff limited use of its trade name and the Registered Marks. (*See* Verified Complaint at ¶¶ 67-81). But Plaintiff was intended to continue operating for the benefit of The Smoot Corporation and the common shareholders of both entities. (*Id.*). In allowing the limited use, The Smoot Corporation instituted controls to assure the continued quality of the trade name and relevant marks as used by Plaintiff. (*Id.*).

As such, Plaintiff was a licensee for the relevant marks. *See e.g.*, *L.F.P.IP, Inc. v. Hustler Cincinnati, Inc.*, S.D.Ohio No. 1:09cv0913 (WOB), 2011 U.S. Dist. LEXIS 121570, at *18 (Oct. 20, 2011) ("implied license agreement will be found where permission to use the trademark is given by the owner coupled with the exercise of reasonable quality control over the licensee"), *see also De Forest Radio Tel. & Tel. Co. v. U.S.*, 273 U.S. 236, 241 (1927); *Exxon Corp. v. Oxxford Clothes, Inc.*, 109 F.3d 1070, 1076 (5th Cir. 1997); *Villanova University v. Villanova Alumni Educational Foundation, Inc.*, 123 F.Supp.2d 293, 307 (E.D. Penn. 2000).

The determination of whether an implied license exists turns on the control element. *Id*. Notably, formalized control is not required to find an implied license; only minimal control is required. *See Lutheran Assn. of Missionaries & Pilots, Inc. v. Lutheran Assn. of Missionaries & Pilots, Inc.*, D.Minn. No. 03-6173, 2004 U.S. Dist. LEXIS 27164, at *27 (Nov. 19, 2004) (internal

citation omitted).  Further, "where the license parties have engaged in a close working relationship, and may justifiably rely on each parties' intimacy with standards and procedures to ensure consistent quality, and no actual decline in quality standards is demonstrated," the lack of formalized control does not negate the existence of an implied license.  *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991*); see also*, *Dept. of Parks and Recreation for the State of California v. Bazaar Del Mundo, Inc.*, 448 F.3d 1118, 1132 (9th Cir. 2006).

Here, The Smoot Corporation always exercised more than the minimal control required. There are three periods to examine regarding The Smoot Corporation's exercise of quality control.

*First*, from 1984 until 2005, Plaintiff was a wholly owned subsidiary of The Smoot Corporation.  (*See* Verified Complaint at ¶).  Thus, The Smoot Corporation exercised complete control over the use of the Registered Marks.

*Second*, from 2005 until 2010, The Smoot Corporation exercised reasonable quality control by vesting its own shareholder and officer Mark Cain, with majority ownership of Plaintiff.  (*See* Verified Complaint at ¶ 39).  Further, Mr. Cain was required to, and did report on Plaintiff's activities to, The Smoot Corporation's Board of Directors.  (*See* Verified Complaint, Ex. H). Further, during this period, Mr. Cain was President of Plaintiff, he was also a shareholder of The Smoot Corporation and in 2008 became a Director of The Smoot Corporation. (*See* Verified Complaint at ¶11).

*Third*, from 2010 until 2021, Mr. Cain was jointly the President of both The Smoot Corporation and Plaintiff.  (*See* Verified Complaint at ¶¶ 14-15).  Thus again, complete control was again exercised over Plaintiff's use of the trade name and relevant marks.  During this period, Plaintiff's President and CEO continued the "One Company" operational concept instituted by

Lewis R. Smoot, Sr. (CITE). And Cain never deviated from that concept, as reflected in the 2020 organizational chart he drafted:



(*Id.*). And, as of 2020, Plaintiff's President and CEO was adamant about the control The Smoot Corporation exercised over Plaintiff, drafting a memorandum regarding the current organizational structure of the entities. (*See* Exhibit I). Indeed, Mr. Cain identified Plaintiff as a "regional operation" of The Smoot Corporation. (*Id.*).

Further, when the Smoot Corporation was considering alternative structures, Plaintiff's President and CEO was adamant that, *if* the Smoot Corporation reorganized, it <u>must</u> maintain its control over the regional units—including Plaintiff—under all circumstances: "In any revised organization structure *at Smoot it is absolutely mandatory that the 'One Company philosophy' be adhered to, despite the separate legal entity structure in the regions."* (*Id.*).

Thus, it is without question that The Smoot Corporation *always* maintained the necessary control over the use and quality of its trade name and protected marks. *Taco Cabana*, 932 F.2d

15

1113, 1121 (5th Cir. 1991).  And Plaintiff cannot challenge this fact now, in light of Mr. Cain's well documented record of operating both entities as "One Company."

> ii.    **As a licensee, Plaintiff is precluded from challenging the validity or ownership of the marks.**

A licensee, it is estopped from contesting the validity of the licensor's title.  *Westco Group, Inc. v. K.B. & Associates, Inc.*, 128 F.Supp.2d 1082, 1086 (N.D. Ohio 2001) (citations omitted).  The licensee's entrance into the licensing agreement is an agreement that the licensor is the owner of the trademark.  *Medd v. Boyd Wagner*, 132 F.Supp. 399, 405-06 (N.D. Ohio 1955); *Chrysler Motors Corp. v. Alloy Automotive Co., Inc.*, 661 F.Supp. 191,192-93 (N.D. Ill. 1987). "A licensee's prior claims of any independent rights to a trademark are lost, or merged into the license, when he accepts his position as licensee, thereby acknowledging the licensor owns the marks and that his rights are derived from the licensor and enure to the benefit of the licensor." *Hot Stuff Foods, LLC v. Mean Gene's Enterprises, Inc.*, 468 F.Supp.2d 1078, 1095 (D. S. Dakota 2006) (citations omitted); *see also Church of Scientology Int'l v. The Elmira Mission of the Church of Scientology*, 794 F.2d 38, 42 (2nd Cir. 1986) (a licensee who enters into a licensing agreement acknowledges the licensor's superior rights to the marks); *Dress for Success Worldwide v. Dress 4 Success*, 589 F.Supp.2d 351, 359 (S.D.N.Y. 2008) (whether licensee had any prior rights is a moot question because the license agreement extinguished any that had existed); *Bunn-O-Matic Corp. v. Bunn Coffee Serv., Inc.*, 88 F.Supp.2d 914, 923 (C.D. Ill. 2000) (licensee's claims of independent rights were lost or merged into license when he accepted his position as licensee and acknowledged that the licensor owns the marks and that his rights are derived from and inure to the benefit of the licensor).

Here, it is undisputed that Plaintiff accepted its position as a licensee.  In 2015, The Smoot Corporation, *under the leadership of Plaintiff's President, CEO, and Majority Owner,* registered

the marks with the U.S. Patent and Trademark Office. (*See* Ex. C and E; *see also*, Trademark Declaration and Emails, Ex. M to the Verified Complaint). If Plaintiff had any independent right to the use of these marks, surely its majority owner would have acknowledged and recorded such a right when he was fully vested with the authority to do so as The Smoot Corporation's President. He did not. So, The Smoot Corporation is the holder of these rights. It has never conceded, abandoned, or otherwise waived these rights.

### iii. Even if Plaintiff retains some right to challenge the trade name and registered marks, it cannot meet the high burden for doing so.

In order for Plaintiff to assert any independent right to a continued use of the relevant marks without The Smoot Corporation's authorization, Plaintiff is required to show that The Smoot Corporation failed to exercise adequate control and establish that the license was uncontrolled. *See Homestead Mtge*., 2010 U.S. Dist. LEXIS 136392, at *38. A challenger asserting a claim of uncontrolled licensing faces a stringent burden and must establish that "the trademark or trade name has lost its significance as an indicator of origin." *Westco Grp., Inc. v. K.B. & Assoc*., 128 F. Supp. 2d 1082, 1090 (S.D. Ohio 2001) *citing Exxon Corp. v. Oxxford Clothes, Inc*., 109 F.3d 1070, 1074 (5th Cir.1997). *See also U. S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 140 (3d Cir. 1981) ("[T]he proponent of a claim of insufficient control must meet a high burden of proof.").

As outlined above, such a challenge must fail. The Smoot Corporation always maintained sufficient controls to maintain its protected rights in the relevant marks. *See Taco Cabanna*, 932 F.2d 1113, 1121.

### 3. Plaintiff's use of the mark is likely to create confusion among the public.

The Smoot Corporation's Counterclaims against Plaintiff include claims for violations of the Lanham Act. The touchstone of a trademark claim under Sections 1114 and 1125(a) is whether the defendant's use of the disputed mark is likely to cause confusion among consumers

regarding the origin of the goods offered by the parties. *Abercrombie & Fitch v. Fashion Shops of Ky., Inc.*, 363 F. Supp. 2d 952, 959 (S.D. Ohio 2005), citing *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997). *See also DOLPHIN SEAFOODS, INC. v. ZARTIC, INC.*, 1983 U.S. Dist. LEXIS 11132, at *17-18 (N.D. Ohio Dec. 5, 1983), citing *Markel v. Scovill Manufacturing Co.*, 471 F. Supp. 1244 (W.D. N.Y. 1979) ("The essence of a claim for trademark infringement or unfair competition is the likelihood of confusion among customers which is caused by the infringement or misrepresentation").

When determining whether a likelihood of confusion exists, a court must examine and weigh the following eight factors: (1) strength of the senior mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) the intent of defendant in selecting the mark; and (8) likelihood of expansion of the product lines/services. *Daddy's Junky Music Stores*, 109 F.3d at 208. Here, the factors balance in favor of The Smoot Corporation. The Sixth Circuit has explained that "[t]hese factors imply no mathematical precision but are simply a guide to help determine whether confusion is likely." *Gen. Motors Corp. v. Lanard Toys, Inc.*, 468 F.3d 405, 412 (6th Cir. 2006). Here, all of the factors weigh in favor of The Smoot Corporation.

### i.    The Smoot Corporation's marks are strong.

The strength of The Smoot Corporation's marks can hardly be disputed in light of the registrations. Further, a mark is strong and distinctive when the public readily accepts it as the hallmark of a particular source; such acceptance can occur when the mark is unique, when it has received extensive advertisement, or both." *Daddy's Junky Music Stores*, 109 F.3d at 280.

First, as it pertains to the formal registration, "once a mark has been registered for five years, the mark must be considered strong and worthy of protection." *See Wynn Oil Co. v. Thomas*, 839 F.2d 1183, 1886-87 (6th Cir. 1988). Here, the marks were registered in 2015. (*See* Verified Complaint, Ex. C; E). They have been unchallenged since. (*Id*).

Further, the mark is commercially strong. The Smoot Corporation has been in business under the "Smoot" name since 1946. (*See* Verified Complaint, ¶ 1). And the marks have been in use since 1986. (*See* Verified Complaint at ¶¶ 1; 14-26; *see also*, Ex. C; E). In that time, The Smoot Corporation has participated in construction projects receiving widespread notoriety, such as the University of Cincinnati College Conservatory of Music, The Columbus Hollywood Casino, Lucas Oil Stadium, the Columbus Convention Center, The Ohio State University Jesse Owns Stadium, Port Columbus International Airport—Air Traffic Control Tower, the Airport Control Tower—Washington Dulles International Airport, the Baltimore Ravens Practice Facility, Johns Hopkins University Bunting Blaustein Cancer Research Center, among many others.[4]

Through these and other high-profile projects, the marks have received extraordinarily strong recognition among the relevant consuming public and have thus become widely known and favorable as identifying The Smoot Corporation's services, regardless of the registrations. *See Daddy's Junky Music Stores*, 109 F.3d at 280. As such, the first factor weighs in favor of The Smoot Corporation.

---

[4] Full portfolio avalible at https://smootconstruction.com/portfolio/ (Last Accessed 4/20/2021 at 11:47 am).

### ii. *The services offered are identical.*

Plaintiff is offering construction services identical to those offered by The Smoot Corporation.  (*See* Verified Complaint, Ex. L; M).  In fact, Plaintiff's website's "Services" section copies The Smoot Corporation's website's "Services" section nearly word-for-word:

*The Smoot Corporation's Services Description[5]*



*Plaintiff's Services Description[6]*



Where the services offered directly compete, confusion is presumed to be likely when the marks are identical or similar.  *See Homeowners Group, Inc. v. Home Mktg. Specialists, Inc*. 931 F.2d 1100, 1108 (6th Cir 1991).

---

[5] Avalible at https://smootconstruction.com/services/ (Last accessed on 4/20/2022 at 1:10 pm)
[6] Avalible at https://smootconstructiondc.com/services/ (Last accessed on 4/20/2022 at 1:10 pm)

Here, of course, Plaintiff is offering identical construction services—down to how those services are advertised on the websites. As such, there is a presumption of confusion, and this factor weighs in favor of The Smoot Corporation. *See Homeowners Group, Inc*., 931 F.2d 1100, 1108.

### iii. *The marks at issue are identical.*

The marks at issue are identical. Plaintiff is actively using the protected '887 and '888 Registrations in offering the same services offered by The Smoot Corporation. The examples are numerous. First, Plaintiff's *current* website repeatedly depicts the '888 Design Mark:





Additionally, Plaintiff's website repeatedly uses the '887 Character mark in order to refer to itself as "Smoot Construction":

---

[7] Avalible at https://smootconstructiondc.com/services/ (Last accessed 4/10/2022 at 10:30 a.m. EST)

# KNOW **OUR WORK.** KNOW **SMOOT.** [8]

# LEADING **SMOOT CONSTRUCTION** [9]

Additionally, as discussed more below, Plaintiff has used the trade name and Registered Marks in at least two recent construction bid proposals. (*See* Verified Complaint, Ex. L; M). Given the identical nature of the marks, the third factor weighs in favor of The Smoot Corporation.

***iv.      There is evidence of actual confusion.***

There is actual confusion at issue here The Smoot Corporation has been contacted by industry partners regarding Plaintiff's statements made to the Columbus Dispatch. (*See* Verified Complaint at ¶¶ 174-184; *see also*, Columbus Dispatch Article, attached to the Verified Complaint as Exhibit N). In that article, Mr. Cain claims to be building on the legacy of his great-grandfather and Plaintiff claims to bring this family legacy to the Columbus construction market:



---

[8] Avalible at https://smootconstructiondc.com/ (Last accessed 4/10/2022 at 10:30 a.m. EST)
[9] *Id.*

(*Id*).  Yet that family legacy has already been established in the Columbus market since 1946, when Sherman Smoot (the grandfather referenced above) founded The Smoot Corporation.  (*See* Verified Complaint at ¶ 1).  Incredulously, the *photo* accompanying this article is of Mark Cain *in the corporate meeting room of The Smoot Corporation.*  (*See* Verified Complaint at ¶ 57)

Actual confusion is strong evidence that injunctive relief should be granted.  *See PACCAR Inc. v. Telescan Technologies, L.L.C*., 319 F3d 243. 249 (6th Cir. 2003).   As such, the fourth factor weighs in favor of The Smoot Corporation.

> **v.**     ***The marketing channels being used are identical.***

This factor involves "how and to whom the respective goods or services are sold." *See Too, Inc. v. The TJX Companies, Inc*., 299 F. Supp.2d 825, 833-34 (S.D. Ohio 2002).  Here, both Plaintiff and The Smoot Corporation offer construction services through a bid process to a governmental body or a general contractor.  In other words, the marketing channels are identical.

And without question, Plaintiff is actively using the Registered Marks in these marketing channels.  First, the Registered Marks have been used in a proposal submitted to the Harvard University:



(*See* Harvard Proposal, attached to the Verified Complaint as Ex. L).

The Smoot Corporation's Registered Marks were used again in a proposal to Bowie University:



(*See* Bowie Proposal, attached to the Verified Complaint as Ex. M). Further, as it pertains to the Bowie project, the services offered indicate the project will be ran by Smoot Construction's D.C. office—implying a tie to, and approval by The Smoot Corporation for this submission:



(*Id*.).

It is likely that any project receiving a bid stamped with The Smoot Corporation's Registered Marks is likely to assume it has received a bid from The Smoot Corporation. Since the channels are identical, this factor favors The Smoot Corporation. *See Too, Inc.,* 299 F. Supp.2d 825, 833-34.

### vi. *Degree of purchaser care*

The nature of the services at issue here and the bid process employed would seem to indicate a higher degree of purchaser care. *See Too, Inc.,* 299 F. Supp.2d 825, 833-34. However, the Court must consider this factor in conjunction with the seven other factors. *Id*. And when doing so, Plaintiff's intent to deceive is overriding. Plaintiff is operated by a former President, CEO, and Director of The Smoot Corporation. (*See* Verified Complaint, ¶¶ 6-11).

### vii. *The intent of Plaintiff is to confuse the public*

The presence of an intent to confuse constitutes strong evidence of confusion. *See Daddy's Junky Music Stores*, 109 F.3d at 287. Here, as fully outlined above Plaintiff's website, project proposals, and media quotes clearly demonstrates an intent to confuse.

### viii. *There is a likelihood of expansion of the services.*

This factor deals with whether either party will expand its services or marketing channels to compete directly with each other. *See Homeowners Group, Inc. v. Home Mktg. Specialists, Inc*., 931 F.2d 1100, 1108 (6th Cir. 1991). This has already occurred. First, The Smoot Corporation has no intention of abandoning its legacy and the services offered in the Washington D.C. and surrounding regions. (*See* Verified Complaint at ¶66). Second, Plaintiff has announced widely its intent to enter the Ohio market and compete directly with The Smoot Corporation there. (*See* Dispatch Article, Ex. N to the Verified Complaint).

The Court need not exhaustively examine the marks and names being used here; they are the same. And similarity of marks is given considerable weight in determining the likelihood of confusion. *Champion Golf Club v. Champions Golf Club*, 78 F.3d 1111, 1119 (6th Cir. 1996); *see also*, *Homeowners Group, Inc. v. Home Marketing Specialists*, 931 F.2d 1100,

1111 (6th Cir. 1991). ("If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity.").

### B. The Lanham act does not require a showing of irreparable injury for injunctive relief—nevertheless irreparable injury is present here.

Irreparable injury is presumed as a result of a finding of a likelihood of confusion for purposes of the Lanham Act. *Abercrombie & Fitch v. Fashion Shops of Ky., Inc*., 363 F. Supp. 2d 952, 966 (S.D. Ohio 2005); *see also Omega Importing Corp. v. Petri-Kine Camera Co., Inc.,* 451 F.2d 1190, 1195 (2d Cir. 1971) "A high probability of confusion makes irreparable injury almost inevitable."). Further, in the Sixth Circuit "no particular finding of likelihood of . . . irreparable harm is necessary for injunctive relief in trademark infringement or unfair competition cases." *Id*., *citing Circuit City Stores, Inc.v. CarMax, Inc*., 165 F.3d 1047, 1056 (6th Cir.1999). Finally, where a former licensee continues to use a trademark after the trademark license has been cancelled, that continued use satisfies the likelihood of confusion test and constitutes trademark infringement. *U.S. Structures, Inc. v. J.P. Structures, Inc*., 130 F.3d 1185, 1190 (6th Cir. 1997); *Westcon Group, Inc. v. KB. & Associates, Inc*., 128 F.Supp.2d 1082, 1091 (N.D. Ohio 2001);

Notwithstanding the lack of need for this Court to determine an irreparable injury is present independent of the confusion, such irreparable injury will certainly occur absent injunctive relief. The marks at issue are synonymous with The Smoot Corporation's business and reputation—a business and reputation which has taken seventy-six (76) years to build. Plaintiff's use, and attempt to capitalize on that history, will dilute the brand and thus cause irreparable harm.

Further, Plaintiff's actions in submitting a falsified application to the Capital Region Minority Supplier Development Council, under the Smoot name, threatens The Smoot Corporation's hard-earned reputation for quality and integrity. (*See* Verified Complaint at ¶113-128). Indeed, the recent application submitted to the Capital Region Minority Supplier

26

Development Council purports to bear the signatures of Lewis R. Smoot, Sr., Lewis R. Smoot, Jr., and Genevieve Smoot. (*See* Verified Complaint at ¶ 117). But none of those individuals signed the document. (*Id*. at ¶¶ 118-120). A comparison of the signatures to another document those individuals did sign reveals that they were likely lifted from that document and pasted onto the D.C. Application:



(*Id*.). Of course, such fraudulent activity, taken under the Smoot name, is the exact type of quality control contemplated by the Lanham Act. (*Id*. at ¶ 133). As such, Plaintiff must be denied use of the Smoot trade name and the Registered Marks before further irreparable harm occurs.

### C. Any hardship to Plaintiff is outweighed by The Smoot Corporation's ownership of the relevant marks.

Where the plaintiff is an authorized owner of a trademark and the defendant is improperly using that mark, the threatened harm to the plaintiff outweighs the threatened harm to the defendant. *KFC Corp. v. Goldey*, 714 F.Supp. 264, 267 (W.D. Ky. 1989) (citations omitted). Here, as outlined above, The Smoot Corporation has established its ownership over the relevant marks and thus any harm complained of by Plaintiff is outweighed. *Id*.

27

### D. Public interest.

An injunction would protect the public from confusion; this is the paramount public policy underlying the Lanham Act. Accordingly, this Court has previously held that avoiding confusion in the marketplace by issuing an injunction would be in the public interest. *Worthington Foods, Inc.*, 732 F. Supp. at 1463, citing *Central Benefits Mutual Ins. Co. v. Blue Cross and Blue Shield Ass'n,* 711 F. Supp. 1423, 1435 (S.D. Ohio 1989). Here, there can be no dispute that the use of the trade name and the protected marks will confuse the public, thus it is in the public interest.

Respectfully submitted,

*s/Patrick Kasson*
Patrick Kasson (0055570)
Thomas N. Spyker (0098075)
Eric J. Weiss (0073066)
**Reminger Co., L.P.A.**
200 Civic Center Dr., Suite 800
Columbus, Ohio 43215
TEL No.: (614) 228-1311
FAX No.: (614) 232-2410
pkasson@reminger.com
tspyker@reminger.com

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was filed using the Court's e-Filing System this 25th day of April, 2022 and that service will be accomplished via the System upon all counsel of record.

*s/Patrick Kasson*
Patrick Kasson (0055570)


## LOCAL RULE 65.1 CERTIFICATE

Pursuant to Local Rule 65.1(b), this Motion was emailed to counsel for all parties of record. All parties effected by this Motion are represented by counsel and have been dully served with the foregoing, as well as all other pleadings and papers filed in the case.

*s/Patrick Kasson*
Patrick Kasson (0055570)