## UNITED STATES DISTRICT COURT FOR
## THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **SMOOT CONSTRUCTION COMPANY** | : | |
| **OF WASHINGTON, D.C.,** | : | |
| | : | **Case No. 2:22-cv-01707** |
| **Plaintiff,** | : | |
| | : | **Judge Michael H. Watson** |
| **vs.** | : | |
| | : | **Magistrate Judge Chelsey M. Vascura** |
| **THE SMOOT CORPORATION, et al.,** | : | |
| | : | |
| **Defendants.** | : | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION
## TO DEFENDANTS' MOTION FOR A TEMPORARY RESTRAINING ORDER AND
## <u>PRELIMINARY INJUNCTION</u>

Marion H. Little, Jr.   (0042679)
Trial Attorney
John W. Zeiger (0010707)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio  43215
(614) 365-9900
(Fax) (614) 365-7900
little@litohio.com
zeiger@litohio.com

Attorneys for Plaintiff

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ................................................................................................ iv

I.      INTRODUCTION ..................................................................................................1

II.     STATEMENT OF DISPOSITIVE FACTS ...........................................................3

     A.     The Smoot Family Business And Family Relationships, And Mr. Cain's Rise To CEO Of The Family Company.................................................................3

     B.     Formation Of Smoot D.C. As A Subsidiary And Its Reorganization As An Independent Corporation In 2005, With Mr. Cain As Controlling Shareholder, President, And CEO ...........................................................................4

     C.     Smoot D.C. Is Not Limited From Competing With Smoot Corporation, Contractually Or Otherwise ........................................................................................7

     D.     Smoot D.C. Is Legally Entitled To Use Its Name – As Is Has For Nearly Two Decades Without Objection – And It Is Not Subject To Any Licensing Restrictions........................................................................................7

     E.     Smoot D.C.'s Lawful Use Of Its Web Site .............................................................9

     F.     Mr. Cain Conducts Business Through Smoot D.C., Consistent With His Obligations As A Director And Officer..................................................................10

     G.     Absence Of Customer Confusion .........................................................................11

     H.     Software .................................................................................................................12

     I.     The Smoot Corporation's Efforts To Disrupt Smoot D.C.'s Start-Up Of Independent Administrative Functions ...................................................................12

III.    LAW AND ARGUMENT....................................................................................13

     A.     The Injunction Factors ..........................................................................................13

     B.     Counterclaimant Cannot Carry Its Burden To Establish Either A Likelihood Of Success Or Irreparable Harm ........................................................14

**Page**

1.  At Best, Smoot Corporation Alleges A Breach Of A Purported Licensing Agreement – Not A Lanham Act Violation.  This Is Not A Basis For Injunctive Relief ............................................................ 14

    a.  The Smoot Corporation's (Judicial) Admissions Against Interest:  It Advances An Ownership and License Agreement Dispute ...................................................... 14

    b.  Issues Of Ownership and Permitted Use Do Not State A Claim Under the Lanham Act ...................................................... 15

    c.  Breach Of An Alleged Licensing Agreement Does Not Amount To Irreparable Harm Under The Lanham Act ................ 17

2.  Even If The Merits Of Smoot Corporation's Lanham Act Claims Were Before The Court On This Motion (Which They Are Not) It Cannot Carry Its Burden To Establish A Likelihood Of Success ........................................................................................ 19

    a.  Smoot D.C. Owns Its Name, Its Use, And All Associated Goodwill and Intellectual Properties .......................... 19

    b.  The Law Permits Mark Cain To Use the Name "Smoot" In His Business And As A Mark ................................................... 21

3.  Alternatively, Smoot Corporation Is Estopped From Seeking Injunctive Relief ........................................................................ 23

4.  Mr. Cain And Smoot D.C. Are Entitled To Tell Prospective Customers About Their History ............................................... 24

5.  Smoot Corporation Does Not Aver A Copyright Interest Or Offer Any Other Claim Or Theory To Support Other Allegations Going Beyond Alleged Trademark Infringement .................. 26

6.  Smoot Corporation's Complaints About Smoot D.C.'s Web Site, At Best, Allude To An Unpleaded Claim For Trade Dress Infringement, But It Fails To Advance Any Facts To Support Such Claim ........................................................................... 27

**Page**

      7.      Because It Never Sought To Secure A Restrictive Covenant, Smoot Corporation Cannot Be Heard To Complain About Competition.................................................................................29

    C.    Smoot Corporation Has No Entitlement To Injunctive Relief On Its Lanham Act Cyberpiracy Claim: It Fails To Identify Any Evidence Of Consumer Confusion Or That Smoot D.C. Is Acting With Bad-Faith Intent To Exploit Smoot Corporation's Marks Or Domain Name(s) ...................30

    D.    Because Defendant's Allegedly Violative Conduct Has Ceased, There Is No Irreparable Harm Of The Type Necessary To Warrant The Issuance Of A Preliminary Injunction ..................................................................32

IV.    CONCLUSION..........................................................................................34

**TABLE OF AUTHORITIES**

**Cases**                                                                 **Page(s)**

Aamco Transmissions, Inc. v. Smith, 756 F. Supp. 225 (E.D. Pa. 1991).....................................17

Albert B. Cord Co. v. S&P Mgmt. Servs., Inc., 2 Ohio App. 2d 148 (1965) ...............................29

Alum. Workers Int'l Union, AFL-CIO Local Union No. 215 v. Consol. Alum. Corp.,
696 F.2d 437 (6th Cir. 1982) .........................................................................................14

Am. Roll Form Corp. v. Chamberlain Grp., Inc., 2015 WL 900715
(N.D. Ohio Mar. 2, 2015)  ............................................................................................28

Bertec Corp. v. Sparta Software Corp., 2019 WL 7249259 (S.D. Ohio Dec. 27, 2019)  ..............18

Bonnell v. Lorenzo, 241 F.3d 800 (6th Cir. 2001) ..........................................................................1

Chattery Int'l, Inc. v. JoLida, Inc., 2011 WL 1230822 (D. Md. Mar. 28, 2011) ........................18

Coca-Cola Co. v. Purdy, 382 F3d 774 (8th Cir. 2004) ........................................................... 31-32

Coleman v. Ann Arbor Transp. Auth., 947 F. Supp. 2d 777 (E.D. Mich. 2013)..........................33

Country Mut. Ins. Co. v. Am. Farm Bureau Fed'n, 876 F.2d 599 (7th Cir. 1989)......................16

Derminer v. Kramer, 386 F. Supp. 2d 905 (E.D. Mich. 2005) .....................................................18

Derminer v. Kramer, 406 F. Supp. 2d 756 (E.D. Mich. 2005) .....................................................16

Digital Ally, Inc. v. DragonEye Technology, LLC, 2013 U.S. Dist. LEXIS 149374
(D. Kan. Oct. 17, 2013)............................................................................................32, 33

Enchant Christmas Light Maze & Mkt. v. Glowco, LLC, 958 F.3d 532 (6th Cir. 2020)..............13

ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915 (6th Cir. 2003) ....................................................16

Fair Wind Sailing, Inc. v. Dempster, 764 F.3d 303 (3rd Cir. 2014).......................................27, 28

FirstPower Group LLC v. WD-40 Co., 2017 WL 3034499 (N.D. Ohio July 18, 2017) .........18, 19

Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC, 139 S.Ct. 881, (2019).................26

Gen. Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405 (6th Cir. 2006).......................................27

Gibraltar, P.R., Inc. v. Otoki Group, Inc., 104 F.3d 616 (4th Cir. 1997)..........................16, 17, 18

**Cases**            **Page(s)**

Haviland & Co. v. Johann Haviland China Corp., 269 F. Supp. 928 (2nd Cir. 1967) ...........23, 24

Heaven Hill Distilleries, Inc. v. Log Still Distilling, LLC, 2021 WL 5985253
(W.D. Ky. Dec. 16, 2021) ................................................................................................13

HER, Inc. v. RE/MAX First Choice, LLC, 468 F. Supp. 2d 964 (S.D. Ohio 2007) ....................31

Inboden v. Hawker, Inc., 35 Ohio L. Abs. 303 (Ohio App. 1941) ................................................29

Int'l Armor & Limousine Co. v. Moloney Coachbuilders, Inc., 272 F.3d 912
(7th Cir. 2001) ....................................................................................................17, 18, 19

John P. Dant Distillery Co. v. Schenley Distillers, Inc., 189 F. Supp. 821
(W.D. Ky. 1960) ................................................................................................................24

Joseph Scott Co. v. Scott Swimming Pools, Inc., 764 F.2d 62 (2nd Cir. 1985) ...........................25

L.E. Waterman Co. v. Modern Pen Co., 235 U.S. 88 (1914) ......................................................21

Laney Chiropractic & Sports Therapy, P.A. v. Nationwide Mut. Ins. Co., 866 F.3d 254
(5th Cir. 2017) ............................................................................................................27, 28

Levitt Corp. v. Levitt, 593 F.2d 463 (2nd Cir. 1979) ..................................................................20

Libertarian Party of Ohio v. Husted, 2014 WL 12647019 (S.D. Ohio Oct. 17, 2014)................13

McNeilly v. Land, 684 F.3d 611 (6th Cir. 2012).........................................................................13

Microsoft Corp. v. McGee, 490 F. Supp. 2d 874 (S.D. Ohio 2007)...........................................16

Mike Vaughn Custom Sports, Inc. v. Piku, 15 F. Supp. 3d 735 (E.D. Mich. 2014) ...................28

Nagler v. Garcia, 2009 WL 10696691 (E.D. Mich. Mar. 17, 2009), aff'd, 370 F. App'x
678 (6th Cir. 2010)............................................................................................15, 16, 17, 18

Nartron Corp. v. STMicroelectronics, Inc., 305 F3d 397 (6th Cir. 2002) ...................................23

Nat'l Lighting Co., Inc. v. Bridge Metal Indus., LLC, 601 F. Supp. 2d 556,
(S.D.N.Y. 2009)................................................................................................................28

Neighbors v. Lawrence Police Dep't, 2016 U.S. Dist. LEXIS 91363
(D. Kan. July 12, 2016)....................................................................................................32

Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566 (6th Cir. 2002) ...................1

| **Cases** | **Page(s)** |
|---|---|
| Perry v. Broad. Music, Inc., 23 F. Appx. 210 (6th Cir. 2001) | 16 |
| Qaran Fin. Express, LLC v. Hassan, 2012 WL 3477403 (S.D. Ohio June 17, 2009) | 13 |
| Sampson v. Murray, 415 U.S. 61 (1974) | 18 |
| Silverstar Ents., Inc. v. Aday, 537 F. Supp. 236 (S.D.N.Y. 1982) | 16, 17, 18 |
| Sleep Sci. Partners v. Lieberman, 2010 WL 1881770 (N.D. Cal. May 10, 2010) | 27 |
| Stancato v. Versace, 1995 WL 437532 (S.D.N.Y. July 25, 1995) | 16 |
| Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) | 32 |
| Thompson v. Marietta Educ. Ass'n, 371 F. Supp. 3d 431 (S.D. Ohio 2019) | 1 |
| Twentieth Century Fox Film Corp. v. Marvel Ents., Inc., 277 F.3d 253 (2nd Cir. 2002) | 19 |
| U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185 (6th Cir. 1997) | 15 |
| USAR Sys., Inc. v. Brain Works, Inc., 887 F. Supp. 84 (S.D.N.Y. 1995) | 18 |

| **Other Citations** | **Page(s)** |
|---|---|
| 15 U.S.C. § 1114(1) | 15 |
| 15 U.S.C. § 1125(d) | 30, 31 |
| 15 U.S.C. § 1125(d)(1)(B)(i) | 31 |
| 15 U.S.C. § 1116(a) | 17 |
| 17 U.S.C. § 411 | 26 |
| McCarthy on Trademarks § 13.6, at 13-17 (2021 ed.) | 21 |

I.                                    **INTRODUCTION**

"A preliminary injunction is an extraordinary measure that has been characterized as ***one of the most drastic tools in the arsenal of judicial remedies***."  Bonnell v. Lorenzo, 241 F.3d 800, 808 (6th Cir. 2001) (emphasis added).  It is a remedy that may "never [be] awarded as of right,' " Thompson v. Marietta Educ. Ass'n, 371 F. Supp. 3d 431, 434 (S.D. Ohio 2019) (Watson, J.).  "The plaintiff bears the burden to justify such drastic relief," id. at 345, and may issue "only if ... the circumstances clearly demand it."  Overstreet v. Lexington-Fayette Urban County Gov't, 305 F.3d 566, 573 (6th Cir. 2002).

The Smoot Corporation's ("Counterclaimant") papers make clear its fear of the inevitable:  competition from Smoot Construction Company of Washington, D.C. ("Smoot D.C.") and its majority shareholder Mark "Sherman" Cain, the grandson of Sherman R. Smoot. The misguided Counterclaim and Motion for injunctive relief are only the most recent attempts undertaken by Counterclaimant to stymie Smoot D.C.  [Exh. A, Cain Declaration ("Cain Decl.") ¶¶ 64-92.]  Counterclaimant has reneged on promises made long ago and dishonored its contractual obligations, thereby wrongfully withholding millions of dollars from Smoot D.C. Smoot D.C. nevertheless persevered, but with its patience having come to an end, Smoot D.C. filed this action seeking to recover those monies wrongful held by Counterclaimant and to put an end, through declaratory relief, Counterclaimant's baseless threats and demands.

In response, Counterclaimant "doubles down" on its misconduct by offering the Court a verified Counterclaim riddled with false statements and misleading innuendo.  So misguided are its efforts, Counterclaimant misses the fundamental legal point that its claims of contested ownership and so-called licensee rights reduces this action to a state law dispute on license and

1

ownership rights for which no injunctive relief may issue – not a case arising under the Lanham Act. If course, Counterclaimant's injunctive demands actually fail on multiple grounds:

- ***Counterclaimant's Limited Registrations.*** Counterclaimant asserts ownership as to various marks, only two of which are registered. Counterclaimant does not possess a registration as to many of the items identified in the Counterclaim and failed to offer evidence, as opposed to conclusory declarations, as to ownership, distinctness, or secondary meaning.

- ***Contested Ownership and License Rights—There Is No Lanham Act Claim.*** Counterclaimant alleges that Smoot D.C. used the registered and unregistered marks (and other items) pursuant to an oral or implied license. Counterclaimant, of course, does not attempt to identify or explain the terms and conditions of the purported license agreement. But that is of no moment at this juncture, it suffices that a dispute from questions (a) concerning the ownership of an intellectual property right; or (b) the existence, terms, or even post-termination of a license agreement ***do not even state a claim under the Lanham Act***. It is merely a breach of contract claim for which injunctive relief is unavailable.

- ***Counterclaimant Does Not Own The Name "Smoot Construction of Washington, D.C."*** Counterclaimant does not own the name "Smoot Construction of Washington, D.C." Smoot D.C. owns the name and the goodwill associated with it, as well as all intellectual property rights held by Smoot D.C. at the time Mark Cain acquired a majority interest in the company. [Cain Decl. ¶¶ 34-37.] No consent, in the form of a license or otherwise, is required for Smoot D.C. to utilize its own intellectual property and assets. Even as to the name "Smoot Construction," at best Counterclaimant has a joint ownership claim. [Id. at 38.]

- ***Counterclaimant's Failure To State Claims For Copyright or Trade Dress Infringement.*** Possessing only limited registrations, many of Counterclaimant's arguments sound in copyright or trade dress infringement. But Counterclaimant does not possess (let along allege) a registered copyright interest, which is a prerequisite to the filing of a claim. Likewise, as to any trade dress claim, Counterclaimant must establish a secondary meaning, but it has failed to make any attempt to do so.

- ***Mark Cain Is Entitled To Use A Family Surname In Any Company With Which He Is Associated, Including Smoot D.C.*** Nor is consent required for a person to utilize his surname or that of its family in a company name or as a mark. Mark Cain's mother was a "Smoot" and even retained it as a middle name after marriage. Mark is the direct lineal descendant of Sherman Smoot. Except for his sister, every shareholder of Smoot D.C. bears the last name "Smoot." The Chairman of its Board is Lewis R. Smoot, Sr. [Cain Decl. ¶¶ 2-13.]

2

- ***Counterclaimant Is Estopped From Advancing Its Claims.***  Further, given Smoot D.C.'s extended use of the name "Smoot," "Smoot Construction," and "Smoot Construction of Washington, D.C." without objection or protest, Counterclaimant is estopped from advancing any claim.  [Cain Decl. ¶ 37.]

- ***Smoot D.C. Has Ceased Utilizing Any Of Counterclaimant's Marks.***  Smoot D.C. is not utilizing the registered marks.  It had removed such marks from its website without prejudice to its position—even though Counterclaimant had not identified any issues with respect to the remaining images on the Web site until this lawsuit.  Counterclaimant has also removed the "CHIPP" content that Counterclaimant sought to register ***after the filing of this lawsuit***.  An injunction may not issue to address historical conduct.  [Cain Decl. ¶¶ 97-107.]

Hence, there is ***nothing for the Court to enjoin***, and the "drastic" remedy of a preliminary injunction is both unnecessary and legally unwarranted.  As a result, Counterclaimant's Motion should be summarily denied, or if the Court believes a hearing is necessary, expedited discovery should be permitted with an evidentiary hearing to follow.

II.     **STATEMENT OF DISPOSITIVE FACTS**

A.     **The Smoot Family Business And Family Relationships, And Mr. Cain's Rise To CEO Of The Family Company.**

Mark S. Cain is the majority shareholder and President and Chief Executive Officer of Smoot Construction Company of Washington, D.C. ("Smoot D.C."), the Plaintiff and Counterclaim Defendant in this case.  [Cain Decl. ¶¶ 1-2.[1]]  Smoot D.C. bears Mr. Cain's mother's and maternal grandparents' name.  Mr. Cain's middle name is "Sherman," as he was named after his grandfather, Sherman R. Smoot, the founder of the Smoot family business – the Columbus construction company that later became Counterclaimant The Smoot Corporation ("Counterclaimant").  Mr. Cain is also a shareholder of Counterclaimant and previously ran its business operations, which are based in Columbus.

---

[1]     The Court is encouraged to review Mr. Cain's declaration in its entirety.  This memoranda provides only an overview of the detailed factual analysis offered therein with accompanying exhibits.

3

In 1971, Mr. Cain's grandfather incorporated his company, which had been operating as an unincorporated proprietorship in Columbus under a similar name, as The Sherman R. Smoot Company. In 1987, The Sherman R. Smoot Company, merged into Counterclaimant. That same year, a subsidiary, the Smoot Construction Company of Ohio (also a Defendant-Counterclaimant), was formed, with Counterclaimant serving as its sole shareholder. [Id. ¶¶ 12-15.] Counterclaimant's current shareholders, in addition to Mr. Cain, include his sister, Candace Cain; his uncle, Lewis R. Smoot, Sr.; and his cousin, Lewis R. Smoot, Jr. All of the shareholders are members of the Smoot family. [Id. ¶ 16.]

Mr. Cain grew up working for his grandfather. Hoping to join in the family business, he studied construction management at the University of Cincinnati, then earned a Master of Business Administration from Carnegie Mellon University. [Cain Decl. ¶ 8.] After working several years for another construction company to gain experience, Mr. Cain became a full-time "Smoot" employee in September 1998 with Smoot D.C. For the next 24 years, he worked his way up the ladder, starting in business development and ending up as CEO of Counterclaimant. [Id. ¶¶ 8-9.]

### B. Formation Of Smoot D.C. As A Subsidiary And Its Reorganization As An Independent Corporation In 2005, With Mr. Cain As Controlling Shareholder, President, And CEO.

In 1984, Lewis R. Smoot, Sr., incorporated Smoot D.C. under the laws of the District of Columbia, and folded into the new company business activities by The Sherman R. Smoot Company was conducting in the Capital area. Although it operated as a subsidiary of Counterclaimant after 1987, Smoot D.C., thus, is a direct successor of The Sherman R. Smoot Company. [Cain Decl. ¶¶ 18-19.]

4

Sherman R. Smoot Corporation of Washington, D.C., controlled the use of its own name. For example, on March 15, 1988, the Directors of the Sherman R. Smoot Corporation of Washington, D.C., passed a resolution consenting to the use of the name The Smoot Development Corporation of Washington, D.C. The language of the resolution specifically reads:

> RESOLVED, that the Directors deem it to be in the best interest of the Corporation that the Corporation hereby consent to the use of the name The Smoot Development Corporation of Washington, D.C., by a corporation to be formed under said name by Lewis R. Smoot, Sr., J. Jeffrey McNealey, and Joseph C. Mathews, and that the officers be and are hereby authorized to execute any and all documents reasonably necessary to effectuate utilization of said name.
>
> [Cain Decl. Exh. 5.]

In 1999, Counterclaimant amended the Articles of Incorporation to change the name of Sherman R. Smoot Corporation of Washington D.C. to Smoot Construction Company of Washington, D.C. [Id. ¶ 29.] Based upon a close review, there are no resolutions, corporate organizational documents, or contracts limiting or imposing restrictions upon Sherman R. Smoot Corporation of Washington, D.C.'s (n/k/a Smoot Construction Company of Washington, D.C.) use of the name registered for it with the District Columbia in any fashion, be it by geography, time, or shareholder ownership.

In 2005, Counterclaimant, which was then led by Mr. Cain's uncle, Lewis R. Smoot, Sr., sold a controlling share of its stock in Smoot D.C., to Mr. Cain under a subscription agreement and promissory notes. Counterclaimant also assigned shares of its stock in Smoot D.C. to other members of the Smoot family. In addition to Mr. Cain and his sister, its current shareholders are several family members with the surname Smoot, including Mr. Cain's uncle, Lewis Smoot, Sr., who is chairman of the board. Mr. Cain ultimately became CEO of Smoot D.C. [Id. 30-32, 65.]

By any measurement, Smoot D.C. is in its third generation of leadership by the Smoot family, and it carries with it the literally decades of work originating with Sherman Smoot.

Significantly, the transaction under which Mr. Cain acquired a majority interest in Smoot D.C. was a stock transaction, not an asset transaction. Thus, Smoot D.C. retained all of its assets and liabilities, including its name and goodwill, and there are no contractual or other limits concerning the use of the entity's name or goodwill as part of the stock sale. [Cain Decl. ¶ 34.]

Smoot D.C. provides general contracting, design-build and construction management services in the District of Columbia and the States of Maryland, Virginia, and Massachusetts and beyond. [Cain Decl. ¶ 4.] The company has been successful. Examples of noteworthy projects it has been involved in include the National Museum of African American History & Culture, the Martin Luther King Jr. Memorial Library, and the U.S. Capitol Dome restoration. [Id. ¶ 46.]

Smoot D.C. is certified as a Certified Business Enterprise ("CBE") under the District of Columbia Small and Local Business Opportunity Commission, a certification that has been and remains in effect. The key requirement for a CBE is that the business must be owned and operated from the District of Columbia and be independently "controlled"; the Counterclaimant could not "control" Smoot Construction Company of Washington, D.C., without impairing its CBE status. [Id. ¶ 44.]

Thus, since 2005, Smoot D.C. has operated as an independent corporation. Smoot D.C. purchased its backroom operational support from Counterclaimant. This arrangement was formalized in an Administrative Services Agreement (sometimes referred herein to as the "ASA") entered into as of May 1, 2005. [Cain Decl. Exh. 13.] This Agreement automatically renews annually unless terminated "during May of any year of the term upon giving at least (30) days' prior written notice thereof" or by "mutual written consent." Neither Counterclaimant nor

Smoot Construction Company of Washington, D.C. has ever provided written notice of termination.

The Administrative Services Agreement, at Section 7(e) also makes clear that Counterclaimant and Smoot D.C., are independent contractors and do not maintain an agency, joint venture, or partnership relationship.   [Id. ¶ 53.]   And separate and apart from the Administrative Services Agreement, there is no oral agreement to the contrary as evidenced by the integration clause contained in Section 7(j) of the Agreement.  [Id. ¶ 54.]

### C.  Smoot D.C. Is Not Limited From Competing With Smoot Corporation, Contractually Or Otherwise.

Smoot D.C.'s Articles of Incorporation specifically set forth that the period of the corporation's duration is perpetual and that its purpose is broad– primarily to provide construction and development services but ultimately including engagement "in any other business or activity for which natural persons may lawfully associate themselves under the laws of the District of Columbia."   [Cain Decl. ¶ 22.]   Smoot D.C's Articles do not impose any geographical limitations on the scope where which it may do business.  [Id. ¶ 23.]

There are no corporate resolutions, organizational documents, or non-compete contracts entered into between Counterclaimant and either Mr. Cain personally or Smoot D.C. that impose any restrictions upon Smoot D.C. right's to compete with Counterclaimant in the constructon business.  [Id. ¶ 39-41.]

### D.  Smoot D.C. Is Legally Entitled To Use Its Name – As Is Has For Nearly Two Decades Without Objection – And It Is Not Subject To Any Licensing Restrictions.

From April 27, 2005, until the events giving rise to this lawsuit, Smoot D.C. has operated continuously under its name without objection or protest by any person or entity, including Counterclaimant, which was fully aware of all activities of Smoot D.C., given the ownership

structure of the company and Mr. Cain's uncle's continued status as Chairman of the Board. [Cain Decl. ¶ 35.]

The trademarks registered by Counterclaimant post-date the transaction by which Mr. Cain became the controlling shareholder of Smoot D.C. According to the Counterclaim, registration of the name "SMOOT" was not secured until July 24, 2014. See Counterclaim, Exh. C. The service mark registration for "SMOOT" was not filed with the state of Ohio until February 12, 2015. [See Counterclaim, Exh. D.] And the trademark registration for "Smoot Construction" in connection with a symbol was not filed until July 24, 2014. [See Counterclaim, Exh. E.] [Cain Decl. ¶ 36.]

Even after these registrations were issued, Smoot Construction Company of Washington, D.C., operated openly and continuously under its long-established name without objection or protest. It did so without a license agreement, as one was not required. [Cain Decl. ¶ 37.] Counterclaimant's "One Company" concept has nothing to with licensing. It is also a concept recently rejected by Lewis R. Smoot, Jr.

> Why is this being sent to this list. WE NEVER AGREED TO THIS DOCUMENT! BULLSHIT! Don't you THINK we should have TALKED before this went out.

> [Exhibit 29 (capitalization in original.)]

Importantly, Counterclaimant does not possess any rights to the name "Smoot Construction" unassociated with the registered symbol (which Smoot D.C. no longer uses). That is a name that Counterclaimant and Smoot D.C. have each used for nearly two decades. Each company jointly owns the mark. [Id. ¶ 38.]

Contrary to Counterclaimants' suggestions, there is no license provision contained in the Administrative Services Agreement. Rather, Subsection 7(k) recognizes that both

Counterclaimant and Smoot D.C. share the common name of "Smoot."   [Id. ¶ 51.]  There is otherwise no provision in the Administrative Services Agreement in which Counterclaimant sought:  (a) to preserve any rights or claims to the name Smoot Construction Company of Washington, D.C.; or (b) purported to limit Smoot D.C.'s use of any mark or any name, including Smoot Construction.  [Id. ¶ 52.]

       E.      **Smoot D.C.'s Lawful Use Of Its Web Site.**

Smoot    D.C.,    owns    the    domain    names    https://www.smootbuilds.com/    and http://www.smootconstructiondc.com.   These are different from the domain names used for Smoot Construction of Ohio and Counterclaimant, which use https://smootconstruction.com/ and a separate domain name for email.  The domain name https://www.smootbuilds.com/ is used for both email and a Web site.  [Cain Decl. ¶ 93.]

Where necessary to avoid confusion on its Web site, as in other areas, Smoot D.C. has made clear it is separate from Counterclaimant and its subsidiary Smoot Construction Company. For example, the Web site's "News" tab contains an item dated March 31, 2022, announcing that "SmootDC" is expanding to New England and the Midwest with two new subsidiaries," adding that "[b]oth are separate from the Columbus-based Smoot Construction company that SmootDC's President and CEO, Mark Cain, was previously co-president of," and identifying S. Cain Development and Construction as the new Columbus subsidiary.  [Id. ¶ 95.] All uses of Smoot Company's registered mark on the Smoot Washington, D.C., Web site were with the knowledge of Counterclaimant.  [Id. ¶ 96.]

As the relationship between the companies began to disintegrate, the parties, assisted by attorneys, addressed the use of logos on Web sites, although nowhere in the correspondence was any issue taken with the non-registered content of Smoot D.C.'s Web site.  [Cain Decl. ¶¶ 97-

105.]  After the filing of this action, however, Smoot D.C. removed from its Web site historical images of employees who were wearing items of clothing bearing any mark registered by Counterclaimant.  [Id. ¶ 106.]  Additionally, with respect to references to "CHIPP" on Smoot D.C.'s Web site, Smoot D.C. has an interest in this mark.  But in preparation for opposing Counterclaimant's TRO Motion, Mr. Cain learned that Counterclaimant has sought trademark protection for this mark last month, in April, after the filing of this lawsuit.  Although Smoot D.C. retains its rights to contest registration of the mark by Counterclaimant, for now this is an issue that need not be resolved by the Court, as it has been taken down from Smoot D.C.'s Web site.  [Id. ¶ 107.]

### F. Mr. Cain Conducts Business Through Smoot D.C., Consistent With His Obligations As A Director And Officer.

As new opportunities are being presented to Mr. Cain, he has made those opportunities available to Smoot D.C., which then pursues and conducts business directly or through a wholly owned entity.  Consistent with this approach, Smoot Construction Company of Washington, D.C., formed a limited liability company for an opportunity in Boston that bears the name "Smoot Boston LLC."  [Cain Decl. ¶ 108]

There is an exception for when Smoot D.C., seeks business in Ohio.  There, it utilizes the registered fictitious name "S. Cain Development and Construction."  This fictitious name was registered, in part, to specifically eliminate the argument now being made by The Smoot Company.  The fictitious name also communicates to the public where Mr. Cain, personally, is working.  This is beneficial to Smoot D.C., given the substantial relationships Mr. Cain possesses in Ohio.  [Id. ¶ 109.]

### G.     <u>Absence Of Customer Confusion.</u>

Counterclaimant has not identified in its papers any companies or persons that are confused as to Smoot D.C.'s existence or its business, or its independence from Counterclaimant as a result of any of the events or actions alleged in the Counterclaim.  [<u>Id.</u> ¶ 111.]

Just the opposite is true.  The distinctness of the respective companies is being emphasized.  An example of this is found in the Columbus Dispatch article marked as Exhibit N to the Counterclaim.  While Counterclaimant is careful to avoid discussing the key aspects of the article, its full content is instructive, including the following passage "SmootDC and its new subsidiaries are separate from the Columbus-based Smoot Construction … ."  The article also reveals that Smoot D.C. "will operate as S. Cain Development and Construction in Columbus, and under a yet-to-be determined name in Boston."   [<u>Id.</u> ¶ 112.]

In addition, Mr. Cain has personally advised his many industry and customer relationships of the separation.  Smoot D.C., engages in joint ventures, and those companies have historically been granted use of marks for inclusion in submissions they make to prospective clients.  Mr. Cain has communicated directly with the senior representatives of Smoot D.C.'s joint-venture partners about the separation of the companies and has directed his staff also to make that clear at all levels of the joint-venture partners. [<u>Id.</u> ¶ 113.]

Smoot D.C. is not using Counterclaimant's trade names for construction proposals.  One proposal that Counterclaimant has misidentified as a construction proposal for a Harvard Project, was prepared by Consigli Construction Co., Inc.  (attached as Exhibit L to the TRO Motion).  The exhibit plainly states "Consigli/Smoot Joint Venture."  This document was prepared in early September, 2021, before any demand was made for discontinuation of the marks.  Similarly, Counterclaimant misidentifies Exhibit M to the TRO Motion as a Project Proposal for Bowie.  It

is not.  It is neither a project proposal nor a final draft.  The final draft is labeled with the new mark for Smoot D.C.  [Id. ¶¶ 114-15.]

H.    **Software.**

Paragraph 187 of the Counterclaim generally alleges that "Plaintiff has converted and refused to return Counterclaimant Counterclaimant assets, including systems."  Paragraph 188 then alleges the unnamed computer system "is proprietary bidding software designed and owned by Counterclaimant The Smoot Corporation."  Mr. Cain is not aware of any copyright registration made, or exclusive license held by, Counterclaimant in the unnamed software.  To the contrary, the software was prepared by independent contractors, specifically Bill Meck, and Mr. Meck asserts ownership of the software either individually or through a company.  [Cain Decl. ¶¶ 116-17.]

I.    **The Smoot Corporation's Efforts To Disrupt Smoot D.C.'s Start-Up Of Independent Administrative Functions.**

While leading Smoot D.C. as its controlling shareholder and top executive, from 2010 through September 2020, Mr. Cain also served as President and CEO of Counterclaimant, and from September 2020 until August 2021, he was co-president of Counterclaimant.  [Id. ¶ 17.] Mr. Cain was the acknowledged leader of the Smoot family business in Columbus, internally and externally, for more than five years.  [Cain Decl. ¶ 83.]

Many of the issues in the Smoot D.C.'s Complaint in this case are intertwined with actions taken by Mr. Cain's cousin, Lewis R. Smoot Jr., who obtained control of Counterclaimant, and became it as Chairman of the Board, CEO, President and Secretary, and removed Mr. Cain as an officer in 2021. [Cain Decl. ¶ 81.]

Smoot D.C. filed the Complaint in this matter primarily to address Counterclaimant's recent actions taken in breach of the Administrative Services Agreement and to squeeze Smoot

DC financially and operationally, matters which are detailed in Smoot D.C.'s Complaint and Mr. Cain's declaration. [Id. ¶¶ 47-92.]

In sum, Counterclaimant has been undertaking a strategy of disrupting Smoot D.C.'s efforts to set up independent backroom administrative functions, withhold monies due Smoot D.C., and threaten litigation if Smoot D.C. seeks to compete in Central Ohio. [Id. ¶ 83.]  The Counterclaim is part and parcel of this campaign.

III. **LAW AND ARGUMENT**

A. **The Injunction Factors.**

"The Court considers and balances four factors when it considers a motion for a preliminary injunction; '(1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.'" Libertarian Party of Ohio v. Husted, 2014 WL 12647019, at *5 (S.D. Ohio Oct. 17, 2014) (Watson, J.).  Preliminary injunctions are appropriate only "for cases where it is necessary to preserve the status quo until trial." Enchant Christmas Light Maze & Mkt. v. Glowco, LLC, 958 F.3d 532, 535 (6th Cir. 2020).

The moving party must demonstrate a right to injunctive relief by clear and convincing evidence.  Qaran Fin. Express, LLC v. Hassan, 2012 WL 3477403, at *2 (S.D. Ohio June 17, 2009) (Watson, J.).  "The proof required for a plaintiff to obtain a preliminary injunction is ***much more stringent than the proof required to survive a summary judgment motion*** because a preliminary injunction is an extraordinary remedy." McNeilly v. Land, 684 F.3d 611, 615 (6th Cir. 2012) (emphasis added.).  See also Heaven Hill Distilleries, Inc. v. Log Still Distilling, LLC, 2021 WL 5985253, at *6 (W.D. Ky. Dec. 16, 2021) (stating this rule in a trademark context).

13

Moreover, the irreparable harm necessary to justify injunctive relief must be "so great" that a later order in the movant's favor "would be inadequate to fully recompense the injured party" and would "render[ ] the award an 'empty victory.' " Alum. Workers Int'l Union, AFL-CIO Local Union No. 215 v. Consol. Alum. Corp., 696 F.2d 437, 443 (6th Cir. 1982).

### B. Counterclaimant Cannot Carry Its Burden To Establish Either A Likelihood Of Success Or Irreparable Harm.

#### 1. At Best, Smoot Corporation Alleges A Breach Of A Purported Licensing Agreement – Not A Lanham Act Violation. This Is Not A Basis For Injunctive Relief.

##### a. The Smoot Corporation's (Judicial) Admissions Against Interest: It Advances An Ownership and License Agreement Dispute.

To begin, Smoot Corporation's request for injunctive relief first fails because injunctive relief is unavailable to address an alleged breach of a "license agreement." The Motion purports to invoke the Lanham Act, but Counterclaimant's underlying claim is, at most, that it authorized Smoot D.C. to use Counterclaimant's trademarks (both registered and unregistered) under an implied or oral licensing agreement and that such licensing rights no longer exist. Specifically, on the very first page of its Memorandum, Counterclaimant asserts that "[f]or over thirty years, [Smoot D.C.] operated as a ***permissive licensee*** of the trade name and relevant marks under The Smoot Corporation." (Emphasis added.) At page 13, it alleges that Smoot D.C.'s use of the marks was subject to an "implied license." These assertions are also repeated throughout its Counterclaim. Paragraph 64, for example, alleges that Smoot D.C. "has ***exceeded the scope of its authority to use and/or the licenses*** provided by Counterclaimant The Smoot Corporation for its' trade name and its nationally protected trademarks." (Emphasis added.)[2]

---

[2]    See also Answer and Counterclaim at ¶ 67 (after 2005, "Plaintiff ***was allowed to continue to use*** Counterclaimant The Smoot Corporation's protected trade name and the Registered Marks."); Id. at ¶ 68 ("The ***scope of the permissible use*** was Counterclaimant The Smoot Corporation's protected trade name

14

Thus, accepting Counterclaimant's allegations as true solely for purposes of this response, such allegations are actually admissions against interest, as the following makes clear.

> **b.**     **Issues Of Ownership and Permitted Use Do Not State A Claim Under the Lanham Act.**

Allegations that Smoot D.C. used the marks under a licensing agreement and its use exceeded the scope of the license do not state a claim under the Lanham Act.  The Motion alludes to Count One of the Counterclaim, in which Smoot Corporation accuses Smoot D.C. of violating 15 U.S.C. § 1114.  Under that provision of the Lanham Act, "infringement occurs only if a registered mark is used '***without the consent of the registrant***.' "  Nagler v. Garcia, 2009 WL 10696691, at *6 (E.D. Mich. Mar. 17, 2009), aff'd, 370 F. App'x 678 (6th Cir. 2010) (quoting 15 U.S.C. § 1114(1) (emphasis in original)); see also U.S. Structures, Inc. v. J.P. Structures, Inc., 130 F.3d 1185, 1188 (6th Cir. 1997) ("The Lanham Act prohibits the ***unauthorized*** use of a registered trademark when selling or advertising a good or service using the trademark is likely to confuse or deceive consumers." (emphasis added.)).  "It follows [then] that 'where the trademark holder has authorized another to use its mark, there can be no violation of the Lanham Act' ... so long as the licensee 'uses the mark as authorized.' "  Nagler, 2009 WL 10696691, at *6 (cleaned up, citation omitted).  Likewise, ***where a mark has multiple owners***, for example, "[a]n owner does not infringe upon his co-owner's rights in a trademark by

---

and the Registered Marks ***only extended to non-competitive use*** while the companies shared common interests."); Id. at ¶ 69 ("The ***scope of the permissible use*** of Counterclaimant The Smoot Corporation's protected trade name and the Registered Marks was predicated on active oversight of Plaintiff's use by Counterclaimant the Smoot Corporation."). (Emphasis added.); Id. at ¶ 71 ("***Plaintiff's use of the trade name and the Registered Marks was closely monitored*** and controlled by Counterclaimant"); TRO Motion at 3 ("Any ***license to use*** the name and marks has thus been cancelled by Plaintiff's abandonment of the 'One Company' approach and other actions") ("For over thirty years, Plaintiff operated ***as a permissive licensee*** of the trade name and relevant marks under The Smoot Corporation."); Id. at 13 ("From 2005 until 2021, The Smoot Corporation ***allowed Plaintiff limited use*** of its trade name and the Registered Marks. (See Verified Complaint at ¶¶ 67-81)"); Id. ("In ***allowing the limited use***, The Smoot Corporation instituted controls to assure the continued quality of the trade name and relevant marks as used by Plaintiff."), Id. ("Plaintiff ***was a licensee*** for the relevant marks.") (emphasis added).

exercising his own right of use." Derminer v. Kramer, 406 F. Supp. 2d 756, 759 (E.D. Mich. 2005).[3]

But the question of ownership and whether use is "unauthorized" does not itself implicate the Lanham Act. "Federal law defines property in trademarks, but who owns the property thus defined is a question of state law – contract or corporate." Country Mut. Ins. Co. v. Am. Farm Bureau Fed'n, 876 F.2d 599, 601 (7th Cir. 1989). "[D]isputes as to the ownership" of intellectual property rights are subject to "ordinary principles of contract law." See Perry v. Broad. Music, Inc., 23 F. Appx. 210, 211-12 (6th Cir. 2001) (following this rule with respect to copyright ownership dispute). And "[i]n cases where a contract establishes which party owns a particular trademark, it is the contract and not the Lanham Act that determines the rights of the parties." Stancato v. Versace, 1995 WL 437532, at *3 (S.D.N.Y. July 25, 1995); see also Gibraltar, P.R., Inc. v. Otoki Group, Inc., 104 F.3d 616, 619 (4th Cir. 1997) ("The Lanham Act is not triggered simply because the subject in dispute is a trademark."). "If the property at issue were lawnmowers rather than trademarks, the proper legal resolution of the case would be no different." Gibraltar, 104 F.3d at 619.

In other words, "[w]hat [Counterclaimant] protests in this case is use in violation of rights of ownership." Gibraltar, 104 F.3d at 619. "This is a contract dispute," not a Lanham Act claim. See Silverstar Ents., Inc. v. Aday, 537 F. Supp. 236, 240-41 (S.D.N.Y. 1982) (plaintiff's allegations that party breached a licensing agreement "cannot properly be maintained as a trademark infringement action" under the Act). "Because in this case the only serious dispute is how the [so-called licensing agreement] allocate[d] ownership rights in the [Smoot] name and

---

[3]     The above is dispositive of Counterclaimant's claims under the Ohio Deceptive Trade Practices Act. "The analysis of an unfair competition claim under Ohio's Deceptive Trade Practices Act, Ohio Rev. Code § 4165.01 et seq., is the same as for an unfair competition claim under the Lanham Act – likelihood of consumer confusion." Microsoft Corp. v. McGee, 490 F. Supp. 2d 874, 880-81 (S.D. Ohio 2007) (citing ETW Corp. v. Jireh Publ'g, Inc., 332 F.3d 915, 920 (6th Cir. 2003)).

business history," "any trademark claims are entirely derivative of the contract issues." Int'l

Armor & Limousine Co. v. Moloney Coachbuilders, Inc., 272 F.3d 912, 916 (7th Cir. 2001).

The if Counterclaimant were to establish it terminated the putative licensing agreement,

the result would be the same – even where the holder "is foremost attempting to enforce its

[purported] ***act of terminat[ing]***" the agreement, it still asserts what "is in essence a contract

dispute," Aamco Transmissions, Inc. v. Smith, 756 F. Supp. 225, 227 (E.D. Pa. 1991) (emphasis

added), that "should be brought under a contract theory." Silverstar, 537 F. Supp. at 240-41.

Accord: Gibraltar, 104 F.3d at 619; Int'l Armor & Limousine, 272 F.3d at 916, 918.  Thus "any

such ***breach of an alleged oral license agreement would not give rise to a trademark***

***infringement claim, but instead must be pursued under a state-law breach-of-contract theory***."

See Nagler, 2009 WL 10696691, at *6 (granting summary judgment on Lanham Act claim

because defendant's alleged failure to comply with terms of unwritten licensing agreement

should have been asserted as a breach of contract claim) (emphasis added).

### c. Breach Of An Alleged Licensing Agreement Does Not Amount To Irreparable Harm Under The Lanham Act.

But why is this important?  As the instant Motion makes plain, Counterclaimant hopes to

better its chances at securing – though wholly unwarranted – injunctive relief, including by

taking advantage Lanham Act, which includes a ***rebuttable*** presumption of irreparable harm.

See 15 U.S.C. § 1116(a).  No such relief is available here, however, because Counterclaimant's

claim does not implicate the Lanham Act in first instance, much less entitle it to an immediate

injunction under the Act.[4]  As with any "[state-law] contract dispute between ... two companies

---

[4]      See Chattery Int'l, Inc. v. JoLida, Inc., 2011 WL 1230822, at *12 (D. Md. Mar. 28, 2011)
(denying request for preliminary relief where trademark ownership was at issue); USAR Sys., Inc. v.
Brain Works, Inc., 887 F. Supp. 84, 86 (S.D.N.Y. 1995) ("The Court's conclusion that USAR's copyright
infringement claim does not 'arise under' the Copyright Act ... of course, dooms USAR's motion for a
preliminary injunction."); Int'l Armor & Limousine, 272 F.3d at 916, 918 (vacating trial court's

over the ownership of property," <u>Gibraltar</u>, 104 F.3d at 619, "any remedies must be sought under state law, and not § 1114," <u>Nagler</u>, 2009 WL 10696691, at *6.

Moreover, Counterclaimant's contractual injuries resulting from the alleged breach of the unwritten licensing agreement are compensable through money damages, precluding a finding of irreparable harm. <u>See</u> <u>Sampson v. Murray</u>, 415 U.S. 61, 90 (1974) ("The possibility that adequate compensation or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm."). Counterclaimant has offered "no evidence of consumer confusion, loss of market share, damage to reputation, or of a catastrophic incident during the [9 months] that the [services of both parties] have coexisted on the market," rather, it states "only [its] 'fears' in that regard." <u>FirstPower Group LLC v. WD-40 Co.</u>, 2017 WL 3034499, at *13 (N.D. Ohio July 18, 2017). Such "'fears' of what might happen [in the market]" are insufficient to transform its compensable contractual injuries into irreparable harm – both as a matter of contract law, <u>see</u> <u>e.g.</u>, <u>Bertec Corp. v. Sparta Software Corp.</u>, 2019 WL 7249259, at *7 (S.D. Ohio Dec. 27, 2019) (denying preliminary relief in contract action where the movant's "CEO merely testified as to his 'fears' regarding loss of market share and provided no data, expert testimony, or market analysis that would support his fears"), and under the Lanham Act, <u>FirstPower Group</u>, 2017 WL 3034499, at *13. And "[i]f [Counterclaimant's] lost profits can be reasonably estimated to assess damages for the alleged breach of contract, they

---

permanent injunction where "the only serious dispute is how the contracts ... allocate [trademark] ownership rights," not a Lanham Act violation); <u>Gibraltar</u>, 104 F.3d at 619 (affirming dismissal of Lanham Act claim including request for injunctive relief, because the case "is a simple contract dispute," "pos[ing] not a question of infringement, but a question of ownership"); <u>Silverstar</u>, 537 F. Supp. at 242 (dismissing complaint after denying preliminary relief, where "this case is essentially a contract dispute between a[ ] ... licensee and a licensor over the right to use [a] trademark"); <u>Derminer v. Kramer</u>, 386 F. Supp. 2d  905, 912 (E.D. Mich. 2005) (affirming magistrate judge's recommendation that preliminary relief be denied, and dismissing for lack of jurisdiction where dispute "focuse[d] on whether the true owners are all enjoying the profits from that property use," adding that "any federal law issues [under the Copyright Act] are not a 'big deal' – they are incidental at best and absent altogether at worst").

can be similarly determined to compensate for whatever [Lanham Act] claim [Counterclaimant ] can prove at trial." Twentieth Century Fox Film Corp. v. Marvel Ents., Inc., 277 F.3d 253, 260 (2nd Cir. 2002).

At bottom, deploying "trademark claim[s] [as] a veneer for a contract dispute" relating to both ownership, a license, or both,  does not entitle Counterclaimant's to preliminary relief which it could not obtain otherwise, Int'l Armor & Limousine, 272 F.3d at 917, and the Court may deny its request for preliminary relief alone.  The Court must resolve ownership and license issues in the ordinary course.

<blockquote>

**2.    Even If The Merits Of Smoot Corporation's Lanham Act Claims Were Before The Court On This Motion (Which They Are Not) It Cannot Carry Its Burden To Establish A Likelihood Of Success.**

**a.    Smoot D.C. Owns Its Name, Its Use, And All Associated Goodwill and Intellectual Properties.**
</blockquote>

Although the foregoing is dispositive, Counterclaimant's Motion fails on multiple on other grounds.  First, and most basic, Smoot D.C. owns its name and, at worst, has co-ownership of the name "Smoot" and "Smoot Construction."  Smoot D.C. has used the name "Smoot" since its inception 1984.  The entity was originally named the "Sherman R. Smoot Corporation of Washington, D.C."  Mr. Cain's grandfather was an original Director and Chairperson of the Board for the company and his uncle was an incorporator.  The Smoot Corporation in 1999 renamed the entity "Smoot Construction Company of Washington, D.C." [Cain Decl. ¶¶ 18-29.]

For its first two decades after it was formed, Smoot D.C. was a subsidiary of Smoot Corporation (or its predecessor), but in 2005 Smoot D.C. was reorganized into an independent corporate entity.  [Id. ¶ 28.] Under a stock purchase agreement, the Smoot Corporation sold Mr. Cain a controlling interest in Smoot D.C., and Smoot D.C. retained all of its assets and liabilities, including its name and other intellectual properties.  [Id. ¶¶ 30-39.]

If Counterclaimant had wanted to preclude Smoot D.C. from using the family name, including in a trademark, it could have bargained for that when the company split into two companies. But it did not. Levitt Corp. v. Levitt, 593 F.2d 463 (2nd Cir. 1979), illustrates how that could have been done. In that case, Defendant William Levitt, who had achieved fame as the "father" of the postwar American suburbia of mass-produced houses, exited his business and entered into contracts in which he sold his interest in his construction company that used his name, ***including its trademarks and goodwill – and he even covenanted away the right to use his own name in connection with any business involved in construction for a period of two years***. Id. at 465-66. But before the two years were up, Levitt started using his name in connection with promoting housing developments built by other developers. Affirming the district court's injunction to stop that practice, the Second Circuit noted that it is "normally unfair" to preclude someone from using his name in a business in which he has experience, but "[w]here … the infringing party has previously sold his business, including use of his name and its goodwill, to the plaintiff, sweeping injunctive relief is more tolerable." Id. at 468.

In the instant case, of course, Mr. Cain did not sell anything – he ***bought*** a controlling interest in a family business and the sale included all the assets, including the company's goodwill and the right to use the "Smoot" name. [Cain Decl. ¶ 34.] Counterclaimant did not negotiate or otherwise secure limits or restrictions from Smoot D.C., or its shareholders, on the use of the entity's name or goodwill as part of this stock sale.

20

   **b.    The Law Permits Mark Cain To Use the Name "Smoot" In His Business And As A Mark.**

Second, separate and apart from ownership, Mr. Cain is entitled to use the "Smoot" name in Smoot D.C., and for that matter, any other business.  It is an American custom to adopt patronymic surnames for businesses.  Mr. Cain is just as much a part of the Smoot family as any under other interested party to this litigation.  As a grandson, Mr. Cain is a lineal descendant of Sherman R. Smoot, who founded the family construction business in Columbus in 1946 under his surname.  Mr. Cain's mother, Nina Smoot Cain, is a daughter of Sherman Smoot. Smoot D.C. shareholders include Mr. Cain's sister, Candace Cain, with all shareholders consisting of family members who bear the surname of "Smoot."  Lewis Sr. even remains the Chairman of the Board.  [Id. ¶¶ 2-10.]

It is hornbook law that "when members of a family business fragment and separate to run competing businesses under the same personal name," trademark law permits "***an informing balancing between competing policies***: on the one hand is the senior user's trademark or service mark rights acquired through the acquisition of a secondary meaning and the protection of the public from confusion; ***on the other hand is the junior user's equitable claim to be able to use his or her own name as a mark in their business***."  McCarthy on Trademarks § 13.6, at 13-17 (2021 ed.) (emphasis added).

Even we incorrectly assumed Smoot D.C. lacked an ownership interest and was the "junior user" of the name "Smoot" as used as a mark, it is also entitled to use the name as a trademark – even through it is sometimes in competition with Counterclaimants – so long as it takes "reasonable precautions" to avoid relevant consumers from confusing Smoot D.C. with Smoot Corporation.  This has been the law for more than a century, as pronounced by Justice Oliver Wendell Holmes writing for the Supreme Court in L.E. Waterman Co. v. Modern Pen

Co., 235 U.S. 88, 94 (1914) (holding that where "a later competitor" uses his own name as a mark, "the law will require him to take reasonable precautions" to avoid causing confusion with a previously established business using the name).

Here, the "balancing between competing policies" has already been struck, and Smoot D.C. has taken the following **_reasonable precautions_** to avoid consumer confusion where both companies are doing business:

- Smoot D.C. has registered to conduct business in Ohio, but it has registered under the fictitious trade name of "S. Cain Development and Construction." It did so specifically to eliminate the argument now being made by Smoot Corporation. [Cain Decl. ¶ 109.]

- Smoot D.C. is advising the public and prospective customers, including on its Web site, that it is a separate company from, and not associated with Counterclaimant. [Id. ¶¶ 111-113.]

- The distinctness of the respective companies is being emphasized. An example of this is found in the Columbus Dispatch article marked as Exhibit N to the Counterclaim. While Counterclaimant is careful to avoid discussing the key aspects of the article, its full content is instructive, including the following passage "**_SmootDC and its new subsidiaries are separate from the Columbus-based Smoot Construction_**. . . ." (Emphasis added.) The article also reveals that Smoot Construction Company of Washington, D.C., "will operate as S. Cain Development and Construction in Columbus, and under a yet-to-be determined name in Boston." Contrary to Counterclaimant's suggestions to the Court, the Dispatch article is written to ensure no confusion. [Id. ¶ 112.]

- Smoot DC had developed its own independent logo. [Id. ¶ 103.]

Indeed, it is telling that in its Counterclaim and in the instant Motion, Counterclaimant has not offered **_one shred of actual evidence_** of a customer or potential customer that has been actually confused by Smoot D.C.'s existence or any actions to date taken by Smoot D.C. in connection with beginning to do business in Ohio – which is the only state where their businesses currently overlap. Given that Smoot D.C. has taken extra steps to address the discrete issues raised in the Counterclaim and based on the above facts, Smoot Corporation falls well short of its burden. Smoot D.C. will not be using the Smoot name as a trademark in Ohio; and

Smoot D.C. has taken reasonable precautions to avoid confusing Ohio customers about which company is which.

### 3. Alternatively, Smoot Corporation Is Estopped From Seeking Injunctive Relief.

Alternatively, Smoot Corporations is estopped from pursing injunctive relief by its "intentional misleading silence" with regard to Smoot D.C.'s use of the marks at issue.  Nartron Corp. v. STMicroelectronics, Inc., 305 F3d 397, 408 (6th Cir. 2002).  After members of the Smoot family company reorganized their business into two separate companies in 2005, ***for the next seventeen years***, Counterclaimant stood by and raised no objection despite knowing that Smoot D.C. was using the Smoot marks.  [Cain Decl. ¶ 37.]  In other words, Smoot D.C. relied on Smoot Corporation's "intentional misleading silence" and was misled into believing Smoot Corporation acquiesced in, or had no objection, to its use of the marks.  So it continued to use the name "Smoot."

Intra-family trademark disputes are somewhat rare in recent years, but two somewhat older cases demonstrate how estoppel precludes not only injunctive relief but also damages for trademark infringement on facts similar to this case.  In Haviland & Co. v. Johann Haviland China Corp., 269 F. Supp. 928 (2nd Cir. 1967), a dispute between members of the Haviland family, which has been manufacturing and exporting china and porcelain ware since the 1840s, the court found that a company owned by one branch of the family was estopped from claiming its trademarks in the family name were infringed by other family members using the family name in the same business because "for many years prior to the initiation of this lawsuit … , plaintiff was aware of defendants' concurrent use of a similar mark and took no action other than sporadic complaints which were never pursued."  Id. at 955.  The court found that the plaintiff's conduct of remaining mostly silent for years was "inconsistent with its assertion of such alleged

exclusive rights," and was "sufficient to justify a belief … that plaintiff had no substantial grievance," and that defendants' continued use of their marks demonstrated "bona fide reliance" on the silence in continuing to use the marks. Id. at 955-956.

Similarly, John P. Dant Distillery Co. v. Schenley Distillers, Inc., 189 F. Supp. 821 (W.D. Ky. 1960), involved members of the Dant family who were involved in separate Kentucky bourbon distilling businesses for many years. In the years leading up to the lawsuit, two distilling companies were owned and operated by two brothers, George and John Dant, who both used the name "Dant" in their company names and in the trademarks on their products. After George Dant died, his estate sold the company's stock and all of its assets, including the "Dant" company name and marks using the name "Dant," to another company. Id. at 825. Later, the purchasing company attempted to enjoin John Dant's company from using the family surname in the mark on its products. The court held that the purchaser was estopped by the conduct of its predecessor, George Dant, who for years "not only stood by and observed" that the John Dant company was using the family name, "but failed to take any affirmative action to circumscribe or limit the use of the name 'Dant' in connection with" the brother's business. Id. at 827.

Here, as in the Haviland and Dant cases, Counterclaimant "stood by" for years and "took no affirmative action" to limit Smoot D.C. from using the name "Smoot" in its business. The Smoot Corporation is now estopped from claiming trademark infringement.

### 4.    Mr. Cain And Smoot D.C. Are Entitled To Tell Prospective Customers About Their History.

As a final point with regard to trademarks, we address Smoot Corporation's baseless complaints that Smoot D.C. is somehow precluded from truthfully communicating to the public and potential customers about its history. History did not screech to a halt and go down the memory hole when Smoot D.C. was originally formed in 1984 or when it became an independent entity in

24

2005.  Its history spans the fifty years and included three different generations of leadership.  [Cain Decl. ¶ 118.]

On point is Joseph Scott Co. v. Scott Swimming Pools, Inc., 764 F.2d 62 (2nd Cir. 1985), a case involving two brothers who went their separate ways and were competing in the family business of designing and building high-end swimming pools, which their father had started.  One brother stayed with the father's company and the other brother left and formed his own company.  The brother who stayed sued the brother who left, objecting to the brother's marketing strategy of highlighting his family pedigree in the swimming-pool business, referring to "generations" of experience and using the slogan "The *Preferred* Builder of Quality since 1937," which referred to the year their father started his company.  Id. at 65.  The court held that the defendant could not be enjoined from referring to his connection with the family business, as he "has a legitimate and compelling interest in using his name in the swimming pool business, having spent twelve years cultivating a personal reputation as a designer of quality custom built pools," and that he "should be permitted to use his name to describe his past accomplishments and expertise in connection with the design, construction and sale of swimming pools."  Id. at 68-69.

Having spent more than twenty years building his own expertise and reputation in the construction business, Mr. Cain, like the defendant in that case, "has a legitimate and compelling interest" in using his family name in connection with the business and should not be enjoined from doing so.  Id., 764 F.2d at 68.

Finally, the court held, the defendant was free to use his name so long as he "made perfectly clear [to customers] that his firm is no longer associated with" the original family company.  Id. at 69.  Here, Mr. Cain is already doing that – even to the extent of using his own name instead of the

name "Smoot" for the Ohio business and, further, adding the disclaimer that the Ohio business is not associated with Smoot Corporation of Columbus.

> **5.    Smoot Corporation Does Not Aver A Copyright Interest Or Offer Any Other Claim Or Theory To Support Other Allegations Going Beyond Alleged Trademark Infringement.**

Smoot Corporation's claims extend beyond registered marks, although it fails to articulate the factual of legal basis for such claims.  Its TRO Motion, for example, asks the court to order Smoot D.C. to "cease using The Smoot Corporation's proprietary bidding software," but the Counterclaim is devoid of any claim for copyright infringement or misappropriation, or any other theory pertaining to protecting alleged rights in software, and its Memorandum in Support fails to make any attempt to establish any rights in software.  As another example, paragraphs 134-59 of the Counterclaim complains about content on Smoot D.C.'s Web site, including an allegation Smoot D.C. has copied its statement of "guiding principles."

The Court should reject this gambit.  Proprietary software and "guiding principles" may be protected by copyright.  However, statutory prerequisite to filing an infringement suit under the Copyright Act is a copyright registration.  See 17 U.S.C. § 411; Fourth Estate Public Benefit Corp. v. Wall-Street.com, LLC, 139 S.Ct. 881, 886 (2019) ("Impelling prompt registration of copyright claims,  17 U.S.C. § 411(a), states that 'no civil action for infringement of the copyright in any United States work shall be instituted until ... registration of the copyright claim has been made in accordance with this title.' ").  No allegation of copyright ownership or infringement is made.

More fundamentally, the ownership of the software is at issue.  This is a contract issue, not an unregistered copyright interest.

     **6.**      **Smoot Corporation's Complaints About Smoot D.C.'s Web Site, At Best, Allude To An Unpleaded Claim For Trade Dress Infringement, But It Fails To Advance Any Facts To Support Such Claim.**

Equally unclear is the nature of Smoot Corporation's complaints about the similarities between its Web site and Smoot D.C.'s Web site. [Counterclaim, ¶ 138-159.] Insofar as these allegations go beyond the claim that Smoot D.C. copied its "guiding principles" – which, at best, sounds in copyright infringement, not trademark infringement – courts have recognized that protection for the "look and feel" of a Web site can be had under a claim for not for ***trademark infringement*** but as trade ***dress*** infringement. See, e.g., Fair Wind Sailing, Inc. v. Dempster, 764 F.3d 303, 309 (3rd Cir. 2014); Laney Chiropractic & Sports Therapy, P.A. v. Nationwide Mut. Ins. Co., 866 F.3d 254, 262 (5th Cir. 2017) (distinguishing trademark claims from trade dress claims, which relate to claims of "aesthetic similarity" between Web sites, based on their "design, layout, motif, or style"); see also Sleep Sci. Partners v. Lieberman, 2010 WL 1881770, at *3 (N.D. Cal. May 10, 2010) (granting a motion to dismiss a "look and feel" trade dress claim because the plaintiff failed to articulate clearly the elements comprising the Web site's "look and feel," which provided inadequate notice of the plaintiff's allegations and raised a question as to whether the plaintiff intended to redefine its trade dress at a future stage of litigation).

"Trade dress refers to the image and overall appearance of a product. It embodies that arrangement of identifying characteristics or decorations connected with a product, whether by packaging or otherwise, that makes the source of the product distinguishable from another and ... promotes its sale." Gen. Motors Corp. v. Lanard Toys, Inc., 468 F.3d 405, 414 (6th Cir. 2006). In the case of a Web site, its "color, graphics, animations, designs, layout, and text" may qualify for trade dress protection. Fair Wind Sailing, 764 F.3d at 310 (citation omitted, cleaned up).

This claim fails however, because "[t]he Complaint is devoid of any allegation that" the design, style, or look and feel of Smoot Corporation's website "ha[s] acquired a secondary meaning which identifies [Smoot Corporation] to the public as the" the source of the website. See Am. Roll Form Corp. v. Chamberlain Grp., Inc., 2015 WL 900715, at *4 (N.D. Ohio Mar. 2, 2015) (dismissing Lanham Act trade dress claims where "there are no allegations in the complaint whatsoever that the design has acquired secondary meaning or that Defendants' use of the design is likely to cause confusion among consumers"). Nor has Smoot Corporation even sufficiently identified the aspects of the Web site that it wants Smoot D.C. to refrain from using. Even if true, the mere fact "that [Smoot D.C.] has copied aspects of [Smoot Corporation's] business and placed them on its website says nothing about the content of [Smoot Corporation's] Web site, let alone whether [Smoot Corporation's] website has a composite look that might constitute a trade dress." Fair Wind Sailing, 764 F.3d at 310. "Missing from those allegations is any description of the design, layout, motif, or style of either [Smoot Corporation's] or [Smoot D.C.'s] marketing or websites." Laney Chiropractic, 866 F.3d at 262. Smoot Corporation's inclusion of images of the Web site does nothing to help it either. Trade dress is protected only to the extent that it is non-functional. Mike Vaughn Custom Sports, Inc. v. Piku, 15 F. Supp. 3d 735, 746 (E.D. Mich. 2014). "[C]ourts cannot be expected to distill from a set of images those elements that are common to a line of products and both distinctive and non-functional." Nat'l Lighting Co., Inc. v. Bridge Metal Indus., LLC, 601 F. Supp. 2d 556, 562–63 (S.D.N.Y.2009). "[I]mages alone do not satisfy the plaintiff's obligation to articulate the distinctive features of the trade dress." Mike Vaughn, 15 F. Supp. 3d at 746 (citation omitted). Here, "[t]he images do not rescue [Smoot Corporation's] trade dress

claim because the Court cannot distill from the images what [Smoot Corporation] claims as protected trade dress or identify what is non-functional about its product design." Id.

The Court must therefore reject any claim dependent upon the appearance of Smoot D.C.'s Website.

### 7. Because It Never Sought To Secure A Restrictive Covenant, Smoot Corporation Cannot Be Heard To Complain About Competition.

The law is well defined that _an employee after severing his connection with an employer may enter into competition with the employer, either on his own account or as an employee of some other competitor,_ unless under a contract with the first employer he has agreed not to do so.

[Inboden v. Hawker, Inc., 35 Ohio L. Abs. 303, 307 (Ohio App. 1941) (emphasis added).]

These comments are equally applicable here. In response to the undersigned counsel's comments, the Smoot Corporation's counsel told this Court at the Local Rule 65.1 Conference that Smoot D.C. was free to compete with Defendants. Yet, the Counterclaim is replete with non-compete references.[5]

So let's be clear. **_Smoot Corporation never bothered to obtain noncompete agreements from Plaintiff or any of its employees_**. [Cain Decl. ¶ 41.] Having no contract, Smoot Corporation thus finds itself in the same untenable position as the plaintiff in Albert B. Cord Co. v. S&P Mgmt. Servs., Inc., 2 Ohio App. 2d 148 (1965), where the court denied injunctive relief for reasons that are equally apt here:

---

[5]     See, e.g., Counterclaim ¶ 60 ("… it was understood that Plaintiff would never be operated in a manner to compete with Counterclaimant … ."); Id. ¶ 62 ("Counterclaimant … has learned that Plaintiff has recently undertaken actions to unfairly and deceptively compete against [it]"); Id. ¶ 73 ("The protection put in place by Counterclaimant … included installing an ownership group and operational setup which would assure that Plaintiff did not compete with Counterclaimant"); TRO Motion at 4 ("Plaintiff is using the trade name and relevant marks to compete."); Id. at 8 ("Plaintiff began using the Smoot name and its protected marks in a manner exceeding its authority and for the purpose of entering into direct competition with The Smoot Corporation"); Id. at 11 ("Mr. Cain began plotting to bring Plaintiff into competition with The Smoot Corporation … .").

> If [plaintiff] had considered that the employment of ... [defendants]
> was of such a character that they would acquire confidential information and
> contacts with customers which would injure ... [plaintiff] in the event
> defendants severed relations with plaintiff and went into business for
> themselves, [*plaintiff] could have secured by contract what it now seeks
> from the Court*.

[2 Ohio App. 2d at 149 (emphasis added).]

Simply put, Smoot Corporation has no basis for seeking, either directly or indirectly, any

form of relief that prevents Smoot D.C. from competing with it.

**C.      Smoot Corporation Has No Entitlement To Injunctive Relief On Its Lanham
Act Cyberpiracy Claim: It Fails To Identify Any Evidence Of Consumer
Confusion Or That Smoot D.C. Is Acting With Bad-Faith Intent To Exploit
Smoot Corporation's Marks Or Domain Name(s).**

Lastly with regard to the Lanham Act, Smoot Corporation's claim under provisions of the

Lanham Act enacted under the Anti-Cybersquatting Consumer Protection Act ("ACPA"), 15 U.S.C.

§ 1125(d), is baseless.  The ACPA provides in relevant part:

(d) Cyberpiracy prevention

(1)(A) A person shall be liable in a civil action by the owner of a mark,
including a personal name which is protected as a mark under this section,
if, without regard to the goods or services of the parties, that person

(i) has a bad faith intent to profit from that mark, including a personal
name which is protected as a mark under this section; and

(ii) registers, traffics in, or uses a domain name that—

(I) in the case of a mark that is distinctive at the time of registration of the
domain name, is identical or confusingly similar to that mark;

(II) in the case of a famous mark that is famous at the time of registration
of the domain name, is identical or confusingly similar to or dilutive of
that mark; or

(III) is a trademark, word, or name protected by reason of section 706 of
Title 18 or section 220506 of Title 36.

[15 U.S.C. § 1125(d).]

In order to establish a claim for violation of this statute, "plaintiffs must show: (1) they have a valid trademark entitled to protection; (2) the mark is distinctive or famous; (3) the Defendants' domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the Defendants used, registered, or trafficked in the domain name (5) with a bad faith intent to profit." HER, Inc. v. RE/MAX First Choice, LLC, 468 F. Supp. 2d 964, (S.D. Ohio 2007) (Sargus, J.). Even assuming the "Smoot" mark is distinctive (as it is surely not "famous") and assuming that Smoot Corporation can satisfy the first four elements of a Section 1125(d) claim, the claim fails under the fifth element – because Smoot Corporation offers no evidence (nor is there any) to establish that Smoot D.C. is using any domain name in bad faith.

Bad faith under the ACPA requires a showing, for example, that the defendant intended "to divert consumers from the mark owner's online location [to a site] that could harm the goodwill represented by the mark … by creating a likelihood of confusion … .," or by a defendant's "offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services … ." See 15 U.S.C. § 1125(d)(1)(B)(i).

Congress' purpose in enacting the ACPA was "to provide legal clarity for trademark owners by prohibiting bad faith and abusive registration of distinctive marks as Internet domain names with the intent to profit from their goodwill." Coca-Cola Co. v. Purdy, 382 F3d 774, 778 (8th Cir. 2004). The legislative history of the ACPA "includes findings that cybersquatters were engaging in consumer fraud and creating public confusion as to the true source or sponsorship of goods and services in a way that would impair electronic commerce, deprive trademark owners of substantial revenues and consumer goodwill, and place overwhelming burdens on trademark owners in protecting their valuable intellectual property." Id. (citing S.Rep. no. 106-140, at *2).

31

The Senate report included concerns such as: " '[I]f someone is operating a web site under another brand owner's trademark, such as a site called "cocacola.com" or "levis.com," consumers bear a significant risk of being deceived and defrauded, or at a minimum, confused.' " (Id. (citing S.Rep. No. 106-140 at *5).

But Smoot Corporation has identified no evidence that ***any consumer*** has been confused by Smoot D.C.'s use of its domain name, or that Smoot D.C. lacks rights to use the "Smoot" name as a mark (see above), or that Smoot D.C.'s use of its company name in a domain name was motivated by bad faith or anything other than a "bona fide offering" of construction services.

> **D.    Because Defendant's Allegedly Violative Conduct Has Ceased, There Is No Irreparable Harm Of The Type Necessary To Warrant The Issuance Of A Preliminary Injunction.**

Finally, a party's alleged harm is not irreparable, and thus, injunctive relief is ***not appropriate*** where the conduct allegedly causing it occurred in the past and ***is no longer occurring***.  That is because, where a plaintiff "alleges only past infractions …, and not a continuing violation or the likelihood of a future violation, injunctive relief will not redress its injury."  Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 109 (1998).  To reiterate, "present harm as the result of past misconduct is not sufficient to justify the injury to the non-movant of granting a preliminary injunction requiring some additional corrective action, because such relief goes beyond the purpose of a *preliminary* injunction."   See Digital Ally, Inc. v. DragonEye Technology, LLC, 2013 U.S. Dist. LEXIS 149374, *29 (D. Kan. Oct. 17, 2013) (internal quotation marks omitted); accord Neighbors v. Lawrence Police Dep't, 2016 U.S. Dist. LEXIS 91363, *43-44 (D. Kan. July 12, 2016) (denying motion for injunctive relief upon finding that the plaintiff could not demonstrate irreparable harm relying on prior filing of purportedly

fraudulent federal criminal cases and prior false arrests because all "conduct occurred in the past" and could not identify "any immediate harm").

Thus, even where a plaintiff demonstrates, by clear and convincing evidence, a likelihood of success on the merits of its claims, preliminary injunctive relief is unwarranted where the allegedly improper conduct has ceased and is no longer ongoing. Indeed, it is a basic proposition that assertions of harm resulting from *__past__* misconduct are insufficient, as a matter of law to support injunctive relief. Coleman v. Ann Arbor Transp. Auth., 947 F. Supp. 2d 777, 783-84 (E.D. Mich. 2013) ("[A] plaintiff seeking injunctive relief must establish ongoing or imminent future harm; a claim limited to past injury is insufficient."). This is true even where the alleged harm is ongoing, but the underlying alleged misconduct has ceased: "[P]resent harm as the result of past misconduct is not sufficient to justify the injury to the non-movant of granting a preliminary injunction requiring some additional corrective action, because such relief goes beyond the purpose of a *preliminary* injunction." Digital Ally, Inc. v. DragonEye Technology, LLC, 2013 U.S. Dist. LEXIS 149374, *29 (D. Kan. Oct. 17, 2013).

- Smoot D.C. has removed the images of employees wearing items bearing the Smoot design mark from its Web site, which Smoot Corporation takes issue with at paragraphs 143-46 of the Counterclaim. [Cain Decl. ¶¶ 97-106.] Thus, there is no risk that Ohio customers who visit Smoot D.C.'s Web page will see the Smoot design logo on photographs of workers.

- Smoot D.C. has even removed references on its Web site to the "guiding principles" known as CHIPP (for Character, Humility, Integrity, Pride, Performance), its use of which Smoot Corporation takes issue with in paragraph 154 of the Counterclaim. [Id. ¶ 107.] Of course, these are the same guiding principles that Smoot D.C. has shared with Smoot Corporation and has followed since its formation in 1984, but to the extent any "confusion" might possibly be caused, that has been prevented by the removal.

**IV.** **CONCLUSION**

For all of these reasons (and additional reasons to be established in the event a hearing is necessary), Counterclaimant cannot carry its burden in seeking the issuance of a preliminary injunction.  The instant Motion should be denied.

Respectfully submitted,

/s/ Marion H. Little, Jr.
Marion H. Little, Jr.   (0042679)
Trial Attorney
John W. Zeiger (0010707)
ZEIGER, TIGGES & LITTLE LLP
3500 Huntington Center
41 South High Street
Columbus, Ohio  43215
(614) 365-9900
(Fax) (614) 365-7900
little@litohio.com
zeiger@litohio.com

Attorneys for Plaintiff

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing was filed electronically with the Clerk of Court using the CM/ECF system this 16th day of May, 2022, which will send notification of such filing to all attorneys of record.

/s/ Marion H. Little, Jr.
Marion H. Little, Jr.  (0042679)

945719