**IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| Smoot Construction Company of Washington, D.C., | : : : | |
| | : | CASE NO.: 2:22-cv-1707 |
| Plaintiff, | : : | JUDGE MICHAEL H. WATSON |
| vs. | : : | |
| The Smoot Corporation, et al., | : : | MAGISTRATE CHELSEY M. VASCURA |
| Defendants. | : | |

**THE SMOOT CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Plaintiff attempts to use this Court's Docket as a platform to continue its deceptive trade practices. Mr. Cain's Declaration—*less than 10% of which is even cited* in Plaintiff's Memorandum—is riddled with misrepresentations. To be sure, it is specifically designed to *publicly* continue the false narrative that Mr. Cain *is* Smoot Construction. *Ignoring the implied license at issue and its bar on the defenses* raised by Plaintiff, Mr. Cain submits a stab-in-the-back Declaration, on a public website, making false and scandalous allegations about the Smoot family members who gave him the very opportunities he has enjoyed. Mr. Cain even continued this false narrative in a recent news article, in which he posed in The Smoot Corporation's office and claimed credit for the success of The Smoot Corporation, instead of the Smoot family and the dozens of construction industry veterans who work there.[1]

Mr. Cain must do this as the law and facts are against him. To be sure, Plaintiff all but ignores the licensee issue and its effect in its brief. The Memorandum is likewise replete with legal and factual inaccuracies. It inaccurately asserts that only a breach of license claim was pled,

---

[1] *See* https://www.dispatch.com/story/business/2022/03/29/mark-cain-expands-smoot-construction-company-washington-dc/7198213001/, last accessed May 31, 2022.

1

not mentioning it was *in the alternative* or the mountain of case law allowing injunctions even in contractual trademark disputes. Moreover, Plaintiff's central misrepresentation—that the "one company" philosophy was something new in 2020 for family harmony—directly contradicts decades of documents showing Mr. Cain knows otherwise. There is no question. Plaintiff was a subsidiary when it started to use the Smoot name. Plaintiff was then operated—after the sale of some shares to Mr. Cain—as a functional subsidiary of The Smoot Corporation, in every respect.

The Smoot Corporation owns the name "Smoot" related to construction and the logo. Plaintiff may not compete using the name Smoot and logo, yet it persists in doing so even today, despite Mr. Cain's false statements to the contrary. As such, injunctive relief should be granted.

**I.      Smoot Corporation has Properly Asserted Claims for Violations of the Lanham Act and is Entitled to Injunctive Relief Regardless of Whether this Court Construes its Claims as Lanham Act Violations, Breaches of Contract,** *or Both***.**

Faced with the overwhelming evidence of its violations, Plaintiff erroneously argues that injunctive relief is not available because Plaintiff was once a Smoot licensee and injunctive relief is purportedly not available for breach of contract actions. (*See* Doc #16; PageID: #260-285). This argument fails for multiple, independent reasons:

   A.    <u>Claims relating to the improper use of a trademark after termination of an implied license are not limited to breach of contract.</u>

Plaintiff starts by arguing injunctive relief is not necessary by characterizing *all* of Smoot Corporation's claims as an alleged breach of a licensing agreement. (Doc. #16; PageID: #280-283). Plaintiff both misstates the law and improperly mischaracterizes the nature of Smoot Corporation's claims.

First, federal courts have routinely recognized that a party who exceeds the scope of an implied license – and/or continues to use a trademark after termination of an implied license – may be liable for both violations of the Lanham Act *and* breach of contract. *See, e.g., La Quinta Corp.*

2

*v. Heartland Props. LLC*, 603 F.3d 327, 343-44 (6th Cir. 2010) (affirming an award of damages for breach of contract and violations of the Lanham Act after defendant's "willful, continued use of Baymont's Systems and trademarks after termination of the Agreement"). One does not preclude the other. Notably, the damages award in *La Quinta* came *after* the district court entered a preliminary injunctive order "precluding further use of Baymont's name, trademarks, and System Standards." *Id.* at 332,

Second—and not even mentioned by Plaintiff—Smoot Corporation's breach of contract claim was pled in the alternative, only. (Doc. #10; PageID: #49, ¶ 64; Civ. R. 8(d)(2)). Here, Plaintiff faces trademark infringement and deceptive trade practices claims, the burden of proof for which are the same. (*Id.* at PageID: #70-77); *see, e.g., Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center,* 109 F.3d 275, 288 (6th Cir. 1997); *Degido v. West Group Corp.,* 355 F.3d 506, 510 (6th Cir. 2004). Notably, when the likelihood of success on the merits of a claim for trademark infringement or unfair competition is proven, irreparable harm necessarily follows with injunctive relief. *See Wynn Oil Co. v. American Way Service Co.,* 943 F.2d 595, 600 (6th Cir. 1991); *Shephard's Co. v. The Thompson Corp.,* 1999 U.S. Dist. LEXIS 21051, at *24 (S.D. Ohio 1999) (citations omitted). As noted by the Sixth Circuit, a finding of likelihood of irreparable harm **is not necessary** to obtain injunctive relief for trademark infringement and unfair competition claims. *Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1056 (6th Cir. 1999).

B.  Plaintiff's status as a former licensee divests Plaintiff of its defenses.

By attempting to cast Smoot Corporation's claims as ones arising only from breach of contract, Plaintiff attempts to obscure the actual importance of the prior license—**Plaintiff cannot now challenge the ownership or validity of the Smoot name and logo**. It is well-established that a licensee's claim of any prior ownership or independent rights to a trademark are lost when the

3

licensee accepts the position as a licensee. *Hot Stuff Foods, LLC v. Mean Gene's Enterprises, Inc.,* 468 F.Supp.2d 1078, 1095 (D.S. Dakota 2006) (citations omitted); *see also Church of Scientology v. Elmira Mission of Church of Scientology,* 794 F.2d 38, 42 (2nd Cir. 1986); *Medd v. Boyd Wagner,* 137 F.Supp. 399, 405-406 (N.D. Ohio 1955); *Chrysler Motors Corp. v. Alloy Automotive Co., Inc.,* 661 F.Supp. 191, 192-193 (N.D. Ill. 1987). Here, Plaintiff's status as a licensee precludes any argument that The Smoot Corporation is not the valid owner of the of the Smoot name and logo. (*Id.*).

      C.    <u>Injunctive relief is available in breach of contract cases.</u>

Even if this were solely a breach of contract case, Plaintiff's argument ignores long-standing law that injunctive relief may be granted for breach of contract claims. *PolyOne Corp. v. Papadopulos,* 2011 Ohio Misc. LEXIS 157, at * 21-24 (Ohio C.P. Apr. 14, 2011) (granting a preliminary injunction based upon irreparable harm from an ongoing breach of contract); *P&G v. Stoneham,* 140 Ohio App.3d 260, 276 (Ohio Ct. App. 2000) (holding the trial court abused its discretion not granting injunctive relief on a breach of contract claim based upon the irreparable harm caused by the breach).

      D.    <u>The authority cited by Plaintiff is inapposite – federal courts routinely award injunctive relief against former licensees who use the mark beyond the scope of the license.</u>

Finally, no authority cited by Plaintiff in their brief precludes injunctive relief under either a Lanham Act or breach of contract theory. Tellingly, Plaintiff strings together mere dicta and bits-and-pieces from 10 cases to try to come up a rule of law that injunctive relief somehow isn't available in a licensee case. (Doc. #16; PageID: #282-84). But this is not the law, and Plaintiff ignores cases directly on point. As just one example, in *L.F.P.IP, Inc. v. Hustler Cincinnati, Inc.,* the Southern District court was confronted with a similar fact pattern where a license had been

4

implicitly granted but the defendant sought to use it beyond the scope of what was allowed. 2011 U.S. Dist. LEXIS 121570, at * 3-11 (S.D. Ohio Oct. 20, 2011). The court, after analyzing the implied license issue, granted injunctive relief, noting that confusion is presumed and any prior ownership was extinguished by the license. *Id.* at *20, 4-26; *see also Fresh Del Monte Produce, Inc. v. Del Monte Foods Co.,* 933 F.Supp.2d 655, 660 (S.D. N.Y. 2013).

Indeed—contrary to Plaintiff's assertion—injunctive relief is routinely granted when a licensee exceeds its permissible use of a trademark. *Am. Nursing Care, Inc. v. Leisure,* 609 F. Supp. 419, 431-32 (N.D. Ohio 1984); *La Quinta Corp. v. Heartland Props. LLC,* 603 F.3d 327, 343 (6th Cir. 2010) (affirming a district court's grant of a preliminary injunction for a licensee who exceeded the scope of the license); *Performance Unlimited v. Questar Publishers,* 52 F.3d 1373, 1377-86 (6th Cir. 1995) (reversing a district court's denial of a motion for preliminary injunction enforcing the terms of license agreement); *accord Sonic Indus. v. Simple Tie Ventures*, No. CIV-20-183-J, 2020 U.S. Dist. LEXIS 150035, at *16 (W.D. Okla. July 23, 2020). Plaintiff has offered this Court no reason to depart from this well-established precedent.

**II.     The Smoot Corporation Will Be Successful on The Merits because Plaintiff Irrefutably Used – and Continues to Use – Smoot Corporation's Trademarks After its Implied License Was Terminated.**

The Smoot Corporation's burden for its trademark infringement and deceptive trade practices claims simply requires (1) it is the owner of a valid trademark; (2) Plaintiff is using the Smoot name and logo; and (3) this use is likely to cause confusion. *See Daddy's Junky Music Stores,* 109 F.3d at 280; *Hensley Mfg. v. Pro Pride, Inc.,* 579 F.3d 603, 609 (6th Cir. 2009). Importantly, where a former licensee, like Plaintiff, continues to use a trademark, that continued use satisfies the likelihood of confusion test and constitutes trademark infringement. *U.S. Structures, Inc. v. J.P. Structures, Inc.,* 130 F.3d 1185, 1190 (6th Cir. 1997); *Westco Group, Inc.*

*v. K.B. & Associates, Inc.,* 128 F.Supp.2d 1082, 1091 (N.D. Ohio 2001); *Molly Maid, Inc. v. Carlson,* 2008 U.S. Dist. LEXIS 50544 at * 6 (E.D. Mich. 2008); *Blue Cross & Blue Shield Mutual of Ohio v. Blue Cross & Blue Shield Association,* 110 F.3d 318, 333 (6th Cir. 1997).

Plaintiff's response ignores the license issue entirely, disingenuously claiming it had no connection to The Smoot Corporation after 2005 other than the ASA Agreement. Not true. These allegations are both belied by Mr. Cain's own declaration and, as set forth below, it is beyond dispute *Plaintiff was a functional subsidiary in a family business* and used the Smoot name and logo under an implied license, which was subsequently terminated.

    A.    <u>Plaintiff does not own the name "Smoot" because it only had an implied license to use the name, which has been terminated.</u>

*Without citing to a single case*, Plaintiff confoundingly asserts it owns the name "Smoot D.C." because Mr. Cain purchased a percentage of the shares. (Doc. #16; PageID: #272). Notably, Mr. Cain concludes this without reference to any evidence that would suggest that the stock purchase agreement even referenced the rights to the Smoot name and logo. (Cain Decl., Doc. #16-2; PageID: #313, ¶ 34). But the cases which support the argument that the sale of a business generally includes its name, all involve the <u>sale of the entire business</u>—and its assets—not a stock purchase. *See e.g., Ferrellgas Partners, Inc. v. Barrow,* 2006 U.S. Dist. LEXIS 9782 at *15 (M.D. Ga. Feb. 16, 2006). Simply put, Plaintiff's rights to the Smoot name and trademark did not change simply because some of its shares changed hands. Plaintiff had an implied license at the time the shares changed hands, and that is what Plaintiff had after the shares changed hands. Mr. Cain purchased majority control in the Plaintiff and, therefore, controlled whatever Plaintiff owned at the time of the sale. And as discussed, *infra,* Plaintiff was a licensee which, in and of itself, prohibits an argument that it owns the Smoot name and logo. *Hot Stuff Foods,* 468 F.Supp.2d at

6

1095; *Church of Scientology,* 794 F.2d at 42; *Boyd Wagner,* 137 F.Supp. at 405-406; *Chrysler Motors Corp.,* 661 F.Supp. at 192-193.

To be sure, in a factually analogous case, Judge Bertelsman of the Southern District, summarized when a license is implied:

> "An implied license agreement will be found where permission to use the trademark is given by the owner coupled with the exercise of reasonable quality control over the licensee."

*Hustler*, 2011 U.S. Dist. LEXIS 121570, *18. In short, if one entity is allowed to use the other's name, the use is a license *so long as the relationship remains close. Id.* This is especially true in closely held family businesses, which alone is sufficient to satisfy the "control" requirement. *Id.* at *19; *Doeblers' Pennsylvania Hybrids, Inc. v. Doebler*, 442 F.3d 812, 823 (3d Cir. 2006). Faced with this well-settled law, Plaintiff relies upon Mr. Cain's conclusory Declaration arguing that Plaintiff was—since 2005—a separate entity from The Smoot Corporation. Mr. Cain's conclusory allegation ignores the evidence—and reality—that The Smoot Corporation retained a high degree of control over Plaintiff, as its functional subsidiary, until January 1, 2022, under the decades-old "one company" philosophy:

1. <u>Mr. Cain falsely represents the "One Company" concept was a recent event.</u>

The "one company" management philosophy itself establishes the closeness needed for an implied license. Knowing this, Plaintiff attempts to downplay the importance of the "one company" philosophy, arguing the "One Company' concept has nothing to do with licensing." (Doc. #16 at PageID: #274). Not true. The determination of whether there was an implied license for use of the Smoot marks and tradename is objective, based only on the conduct of the parties. *See e.g., Hustler*, 2011 U.S. Dist. LEXIS 121570, at *18, *citing Doeblers' Pennsylvania Hybrids, Inc.,* 442 F.3d at 824 ("It is irrelevant whether parties thought of the arrangement at the time in

7

terms of an implied license. The test for whether or not an implied license existed is based solely on the objective conduct of the parties."). The issue is whether The Smoot Corporation exercised "reasonable quality control" over Plaintiff. *Hustler,* 2011 U.S. Dist. LEXIS 121570, * 18. Because The Smoot Corporation ran its operations—including the operations of Plaintiff and The Smoot Corporation's wholly owned Ohio subsidiary—as "one company," the relationship was clearly sufficiently close to maintain an implied license status. *(Id.).*

And, as set forth below, Plaintiff's attempt to hide from and ignore the extensive "one company" history of operation is easily disproven.

> 2. <u>For nearly twenty years, Plaintiff's President and CEO, Mark Cain, was an architect of the "one company" concept—so long as he thought it was his "one company."</u>

**Cain Misrepresentation:** "*The two companies are separate and independent entities.*" (Cain Decl. ¶¶ 97-107).

**Cain Misrepresentation:** "*It was with respect to a board decision to "foster 'one company approach', no separation." This entire submission was done in an effort to resolve the conflicts Lewis R. Smoot, Jr. and I had regarding the [2020] concept of "co-presidents".*" (Cain Decl. ¶ 60).

These were not independent entities. They had the same president – Mr. Cain. Now, only when it's not to his ostensible benefit, Mr. Cain disavows the "one company" philosophy both as never being in place and as a new concept. Neither are true. Mr. Cain claims this *now* only because it is no longer *his* one company as he is no longer The Smoot Corporation's President. But the objective documents show Mr. Cain's lack of candor to this Court—the "one company" approach has been a cornerstone of the family business **for decades**:

- 3/3/2001, Board Minutes (noting Mark Cain's presence): "The theme 'One Company…different locations' was being actively implemented and indeed all offices are working more closely together than has been the case in the past." (*See* Exhibit A, "Declaration of Lewis R. Smoot, Jr.," ¶ 1, incorporated Ex. 1).

- 3/3/2003, Smoot Operating Partnership Minutes, November 3, 2003 (Noting Mark Cain's presence): "The goal of the Committee is to identify and develop

     "Smoot Tools" (to included defined process and format) necessary to support and train Smoot Best Practices." (*Id*., ¶ 2, inc. Ex. 2).

- Board Minutes, 11/18/2003: The Board directs that "as part of the "One Company" process, all estimators are to be under the direct supervision of John Jones." (*Id*., ¶ 3, inc. Ex. 3).

Even after April 27, 2005, when Plaintiff was restructured with Mr. Cain becoming its majority shareholder, (Doc. #16; PageID: #271-72), nothing changed with regard to the "one company" principle. Plaintiff continued as a functional subsidiary of The Smoot Corporation. Indeed, Mr. Cain became even *more involved* in making sure the companies stayed "one":

- 8/23/2005, Board Minutes: Mark Cain broke into a working group with other executives across the region to refine the "Smoot Operating Partnership." As reflected in those Minutes "one of the prime goals of the SOP is "One Company", with all three offices [Ohio, Washington and Indiana] networking closely together." "Trust among equals is key, noting that "all egos shall be parked at the door." (*See* Ex. A, ¶ 4, inc. Ex. 4).[2]

- 5/26/2010, Strategic Meeting Minutes (noting Mark Cain's presence): The meeting purpose provided a platform of leadership including the coordination and utilization of resources regionally and across the regional borders where and when appropriate – "One Company beyond accounting" (*See id.*, ¶ 5, inc. Ex. 5).

- 10/12/2015, Operations Meeting Agenda: Mr. Cain – **President of both** - gave a presentation on **"One company, three regions [Ohio, Washington and Indiana]."** (*See id.*, ¶ 6, inc. Ex. 6).

- 3/2/2017, Cain Email to D.C. VP McIntosh: "[M]ost interregional barriers have been removed and everyone's common desire for a consistent platform of operations, new ideas that are relevant will be welcomed." (Ex. B, "Declaration of Timothy Harden," inc. Ex. 1).

Despite this, Mr. Cain paints the "one company" operation as some new 2020 compromise. (Cain Decl. ¶ 60). But this is contradicted by his own recent statements: "[i]n any *revised* organization structure at Smoot it is absolutely mandatory that the 'One Company philosophy' be

---

[2] Exs. 4 through 6 of the Declaration were inadvertently marked as 3 through 5 in the text of the Declaration. For purposes of this Motion, the exhibits shall be referenced by their correct, marked numbers that are attached thereto.

9

adhered to, despite the separate legal entity structure in the regions." (Doc. #10-9, PageID: #132, Ex. I) (emphasis added). When viewed in light of the decades' long history of "one company," this statement's meaning is clear – it wasn't a new thing. And, as discussed below, this was how the companies were always run. Plaintiff, the wholly owned Ohio subsidiary, and the majority owned Indiana subsidiary, were always treated as the same, as "one company."

But not deterred by facts, Mr. Cain and Plaintiff falsely claim Lewis Smoot Jr. rejected the one company approach. (Doc. #16, PageID: #274.) But even a cursory glance at the cited exhibit (29) shows this is yet another misrepresentation. (*See* Doc #16-1). Mr. Smoot is clearly objecting to the distribution of documents concerning the new co-president's model without his approval – not the decades old one company philosophy. There is no way to read Exhibit 29 as Plaintiff and Mr. Cain contend. The gross misrepresentation of Exhibit 29 is a testament to the lack of candor in both Plaintiff's brief and Mr. Cain's Declaration, concerning the "one company" philosophy.

3. <u>Plaintiff has always operated as a subsidiary of The Smoot Corporation, financially.</u>

**Cain Misrepresentation:** "*Smoot Construction Company of Washington, D.C., purchased its backroom operational support from The Smoot Corporation.*" (Cain Decl. ¶ 47).

Plaintiff attempts to avoid the combined operations of the two entities by hiding behind the ASA – which it contends deals only with "administrative support services." (Doc #10; PageID: #78). But the ASA does not require Plaintiff to operate as a functional subsidiary, as it did. For example, while not covered under the ASA, in 2015, Mr. Cain signed a notarized indemnity agreement certifying that The Smoot Corporation's CFO, Nathan Robinson, was also CFO of Plaintiff. (*See* Ex. C, "Declaration of Nathan Robinson," at ¶¶ 11-14). Notably, Mr. Robinson has never been compensated by Plaintiff, only by The Smoot Corporation. (*See id.*, at ¶ 15).[3] In other

---

[3] Importantly, the document was notarized in Franklin County, Ohio. (*See id.*, at ¶ 14).

10

words, Mr. Cain designated The Smoot Corporation's CFO as Plaintiff's CFO. Not because he was purchasing "backroom" support, but because it was operated as one company. Just as Mr. Cain was President of both.

And, in fact, Plaintiff's financials for revenue/expenditure and assets/liabilities were structured as if it was a subsidiary of The Smoot Corporation, despite Mr. Cain's majority ownership. (*Id.*, at ¶¶ 10, 17-18).[4] For example, the total finances of The Smoot Corporation were represented at the top of the financials—and included Plaintiff's performance along with the wholly owned Ohio subsidiary and the majority owned Indiana subsidiary's operations performance. (*Id.*, ¶ 10). Further, Plaintiff's performance was broken out in the exact same manner as the Ohio and Indiana subsidiaries. (*Id.*). Finally, *from an accounting standpoint for revenue/expenditure and assets/liabilities, Plaintiff was always treated as a subsidiary* of The Smoot Corporation both prior to, and through the entirety of, Mr. Cain's tenure as The Smoot Corporation's President. (*Id.* at ¶¶ 19-20). There can be no dispute they were "one company," functionally. (*Id.* at ¶¶ 10, 16-18). In fact, Plaintiff was never independently audited, it was part of The Smoot Corporation's audit. (*Id.*, at ¶ 18).

    4. <u>Plaintiff and The Smoot Corporation shared bonding, banking and insurance.</u>

The "one company" philosophy was further reinforced by the shared bonding, banking, and insurance practices of the entities. Although the ASA provided for "administrative support services," (Doc. #10-1, Ex. #1), it made no reference to sharing actual insurance policies, a treasury bank account or bonding arrangements, like *subsidiaries do with a parent* in *a one company* arrangement. (*Id.*). But that is exactly what Plaintiff and The Smoot Corporation did. Prior to

---

[4] The financials were provided to Mr. Cain, as his role as President of The Smoot Corporation, on a regular basis. (*Id.*, at ¶ 9).

11

and through Mr. Cain's entire tenure as CEO, Plaintiff and The Smoot Corporation shared a bonding program. (*See* Ex. C, inc. Ex. 1). They also shared an insurance program. (*Id.*, at ¶ 21). Plaintiff was reflected on both programs, in the exact same manner as Smoot's Indiana subsidiary. (*Id.*, at ¶ 14, 21). There is no dispute, from a bonding and insurance standpoint, Plaintiff was treated as a Smoot subsidiary until and through January 1, 2022. (*Id.*).

In addition, The Smoot Corporation and Plaintiff shared a treasury banking account.[5] (*Id.*, at ¶ 10). Every day, the funds deposited into Plaintiff's account were swept into a Smoot Corporation account, as were the funds of the majority owned Indiana operation and the Ohio wholly owned subsidiary. (*Id.*). Further, Plaintiff, Indiana, Ohio, and the Smoot Corporation all shared a line of credit. (*Id.*, at ¶¶ 17, 19). When Plaintiff had unprofitable years, the shared line of credit with The Smoot Corporation was used to sustain Plaintiff. (*Id.*, at ¶ 19). They were "one company," with Plaintiff being a functional subsidiary.

> 5. <u>The Smoot Corporation oversaw every aspect of Plaintiff's information technology system.</u>

> **Cain Misrepresentation:** "*Smoot Construction Company of Washington, D.C., had its own computer server as it was not duplicated with or for The Smoot Corporation*" (Cain Decl. ¶ 53).

Mr. Cain's assertion that the companies were separate from an IT perspective is false. The Smoot Corporation has already attached Mr. Cain's emails to its pleadings and motions. (*See* Doc. #10-7, Ex. #7). Mr. Cain is well aware that, until late 2021 when Plaintiff began taking competitive action against The Smoot Corporation, all Smoot entity information systems were maintained on the same network. (*See* Ex. B, at ¶¶ 7-8). In fact, all systems and servers were maintained by the

---

[5] A word about Mr. Cain's false assertion that 7 million dollars are owed to Plaintiff. He failed to mention that, while one column showed a 7-million-dollar number, another column showed millions of dollars payable from that 7 million number. (*Id.* at ¶ 20). Randomly taking a single line from financials is as bad a mischaracterization as Plaintiff's attempt to cast exhibit 29 as being an objection to the "one company" approach. Even Plaintiff's accountants recognize Mr. Cain's misrepresentation here. (*Id.*, ¶ 20, inc. Ex. 2)

12

IT team in Columbus, Ohio. (*Id.*, at ¶ 7). Once Plaintiff secured its own email domain *very recently*, Mr. Cain had to repeatedly remind people emailing him at the legacy Smoot address to use the new email. (*See id.*, at ¶ 11, inc. Ex. 1). ("Please only use the smootbuilds address. Second reminder."). There is no dispute. Mr. Cain managed Plaintiff with a Smoot Corporation email address using Smoot Corporation IT systems until last Fall. One email address, "one company."

      6.     <u>The Smoot Corporation oversaw Plaintiff's project bidding.</u>

> **Cain Misrepresentation:** "*I am not aware of any copyright registration made [sic] or exclusive license held by, The Smoot Corporation in the unnamed software. To the contrary, the subject software was prepared by independent contractors, namely Bill Meck, and he asserts ownership of the software either individually or through a company.*" (Cain Decl. ¶ 117).

Obviously, for a construction company, bidding is a crucial component of the business. And Plaintiff was permitted to use The Smoot Corporation's proprietary software while Plaintiff's bidding was overseen by a Smoot Corporation employee. Mr. Cain's representation that the software is not owned by Smoot Corporation, but rather Mr. Meck, is grossly false. Mr. Meck himself disagrees. (*See* Ex. D, "Declaration of Bill Meck," at ¶ 11). Mr. Meck confirms that the software at issue was designed exclusively for The Smoot Corporation. (*Id.*, at ¶ 6). And, contrary to Mr. Cain's statement, Mr. Meck does not assert any ownership interest in the software. (*Id.*, ¶ 11). Thus, without question, Plaintiff used and is currently using The Smoot Corporation's proprietary software to further its now competitive business interests. This is not an administrative support service – it is use of The Smoot Corporation's proprietary software.

Further, as reflected in the previously noted Board Minutes, beginning in 2003, all bidding was placed under the supervision of The Smoot Corporation's John Jones. (*See* Ex. A, inc. Ex. 3). Since that date, until late 2021, Mr. Jones, a Smoot Corporation employee, <u>supervised all Smoot bidding</u>, including bidding by Plaintiff. (*See id.*, ¶¶ 6-7). This is not a *support* service – he *supervised* it. And this bidding was overseen the exact same way that it was overseen for The

13

Smoot Corporation's Ohio wholly owned subsidiary and the majority owned Indiana subsidiary. (*See id.*). Simply put, from a bidding perspective, all Plaintiff's bidding was overseen by The Smoot Corporation on its software. (*See id.*).

The evidence is overwhelming. Plaintiff never owned the Smoot name or the logo. It was a license given by The Smoot Corporation, when Plaintiff was a subsidiary and then a functional subsidiary. This close relationship meets the test for an implied licensee. *Hustler,* 2011 U.S. Dist. LEXIS 121570, *18; *Doebler,* 442 F.3d at 823. That close relationship, however, is over. The Smoot Corporation is the licensor entitled to sue for Plaintiff's improper use of the company name and logo, without authorization. *Hustler*, 2011 U.S. Dist. LEXIS 121570, *18 (if one entity is allowed to use the other's name, the use is a licensee *so long as the relationship remains close.*)

    B.    <u>Mr. Cain's last name is not Smoot, and he thus has no claim to the Smoot name under the family name exception.</u>

Plaintiff is further not entitled to use the name "Smoot" under the family name exception. Unsurprisingly, Plaintiff does not cite to a single case in support of this assertion, for good reason. (*See* Doc. #16 at PageID: #287). The narrow exception is only applied when an individual's **own surname** is at issue. *Hustler,* 810 F.3d at 427 ("Courts, it is true, are reluctant to prevent individuals from using their **own surnames** and business.") (Emphasis added).

Undeterred by actual caselaw, Plaintiff cites to only a "hornbook" in support of his position that the "family name" exception applies simply because somewhere in his lineal heritage a relative had Smoot as a last name. The Courts, however, disagree. The exception has only been applied when individuals are using their own surname. *Id.*; *Circuit City Stores, Inc. v. CarMax, Inc.,* 165 F.3d 1047, 1054 (6th Cir. 1999); *E&J Gallo Winery v. Gallo Cattle Co.,* 967 F.2d 1280, 1288 (9th Cir. 1992). Even so, if one family member attempts to sow confusion in the marketplace using a surname, like Mr. Cain, that is still prohibited by the law. *Hustler,* 810 F.3d at 427.

14

      C.    <u>Plaintiff's failure to register the Smoot name and logo is fatal to its claim of ownership.</u>

Plaintiff's implied license extinguished any alleged prior right to the Smoot name and logo because any rights to a trademark are lost if Plaintiff was a licensee. *Hot Stuff Foods, LLC,* 468 F.Supp.2d at 1095; *see also Church of Scientology,* 794 F.2d at 42 ; *Boyd Wagner,* 137 F.Supp. at 405-406 (N.D. Ohio 1955); *Chrysler Motors Corp.,* 661 F.Supp. at 192-193. As Plaintiff's use of the Smoot name, coupled with the close relationship, establish the implied licensee status, Plaintiff has no right to the name and logo after the implied license was terminated. Moreover, Plaintiff's submission to The Smoot Corporation's superior rights is evidenced by two key events.

*First,* when The Smoot Corporation formally registered its marks, Mr. Cain was President and CEO of both entities. (*See* Doc. #10, PageID: #42, Ex. #3-6). The formal registrations make no mention of D.C.'s use or rights to the name. (*Id.*). No coexistence agreement was reached between the Smoot Corporation and Plaintiff.

*Second,* Mr. Cain was well aware of the need for such an agreement because, in registering the marks, The Smoot Corporation had to negotiate with an unrelated Smoot entity. (*See* Ex. E, "Coexistence Agreement"). Under Mr. Cain's leadership, The Smoot Corporation negotiated and entered a coexistence agreement with another Smoot entity. (*Id.*). Absent from this agreement is any mention of Plaintiff. (*Id.*). This is because, at the time of the agreement, Mr. Cain understood that The Smoot Corporation owned the relevant marks and names. Thus, there was no need to mention Plaintiff, who only had limited rights through the Smoot Corporation's permitted use. It is clear that Plaintiff accepted its position as a licensee.

      D.    <u>An injunction should be issued because Plaintiff's continued use of the Smoot name and its logo satisfies the likelihood of confusion test.</u>

In attempt to circumvent the fact it was a (former) implied licensee, Plaintiff asserts an odd "junior user" argument, with scant authority in support. (Doc. #16; Page ID: #287-288). Plaintiff was an implied licensee, however, not a junior user. Regardless, Plaintiff's argument that there is no evidence of customer confusion, and therefore no need for an injunction, fails:

*First* is an email from a customer seeking to address business matters with Mr. Cain because he has a "Columbus office." (Ex. B-1). There is obvious confusion here. Indeed, Plaintiff argues it has registered to do business in Ohio under a different name. This alone, however, will not prevent confusion where, as here, it is an any Ohio company with "Smoot" littered across its website, email addresses and documents.

*Second*, there is an exceptionally strong need for injunctive relief if a former licensee is a related company competing in the same industry. *Molly Maid,* 2008 U.S. Dist. LEXIS 50544 at *6. Obviously, Mr. Cain was the President of The Smoot Corporation and is Plaintiff's President. According to his own Declaration, he is very visible in the construction industry and claims to be the architect of The Smoot Corporation's success. As discussed in *Molly Maid,* the likelihood of confusion between The Smoot Corporation and Plaintiff, which was a subsidiary and then functional subsidiary, is great. *Id.*; *KFC Corp. v. Goldey,* 714 F.Supp. 264, 267 (W.D. Ky. 1989).

*Third,* there is no need to prove actual confusion. Where a former licensee continues to use a trademark after the trademark license has been cancelled, that continued use satisfies the likelihood of confusion test and constitutes trademark infringement. *See Burger King Corp. v. Mason,* 710 F.2d 1480, 1492-93 (11th Cir. 1983) (holding that because of the risk of customer confusion, "many courts have held that continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark

16

infringement."); *accord U.S. Structures, Inc.,* 130 F.3d at 1190; *Westco Group, Inc.,* 128 F.Supp.2d at 1091; *Molly Maid, Inc.,* 2008 U.S. Dist. LEXIS 50544 at * 6; *Blue Cross & Blue Shield Mutual of Ohio,* 110 F.3d at 333; *IHOP Franchising, LLC v. Tabel,* No. 13-2641-KHV-TJJ, 2014 WL 1767199, at *9 (D. Kan. Apr. 15, 2014). Here, an implied license agreement between Plaintiff and Smoot governed Plaintiff's use of the mark for decades. It is not a "junior user." It now has no right to the mark after it established itself as a competitor—abandoning the "one company" philosophy. As a result, injunctive relief is appropriate.

### III. The Smoot Corporation is Not Estopped from Seeking Injunctive Relief.

Plaintiff makes the odd argument that The Smoot Corporation is estopped from arguing Plaintiff is not entitled to use the name Smoot and logo. This argument fails for multiple reasons.

*First,* the *Haviland* and *Schenley Distillers* cases cited by Plaintiff involve companies which were operated separately, for quite some time. *See Haviland & Co. v. Johann Haviland China Corp.*, 269 F. Supp. 928, 955 (S.D.N.Y. 1967) (noting Plaintiff's "conduct for a period of many years"); *John P. Dant Distillery Co. v. Schenley Distillers, Inc.*, 189 F.Supp. 821, 822 (W.D.K.Y. 1960) (noting the marks at issue "had existed in the whiskey business for 50 years without protest"). Here, the breakup has occurred very recently, effective January 1, 2022.

*Second*, Plaintiff has not put forth a single piece of evidence that it relied upon anything—nothing is cited in the Motion.

*Third,* there is evidence that Plaintiff intends actual confusion. Despite purporting to have its own logo, Plaintiff has continued to use The Smoot Corporation's logo—to this day. (*See infra* Section IV). And as of the date the Counterclaim was filed, Plaintiff was making every effort to portray itself to the world as The Smoot Corporation, even using The Smoot Corporation's logo and corporate philosophy on its website. As set forth above, unlike the parties in the cases cited

17

by Plaintiff, Plaintiff functioned as a functional subsidiary, sharing The Smoot Corporation's President and complete common management from its CFO to its estimation functions. There is nothing—until Plaintiff began openly competing with The Smoot Corporation and blatantly using both its logo and its name—from which Plaintiff could have relied upon thinking they could continue to use the name and logo *while they compete*.

IV. <u>**Plaintiff's Illegal Conduct Has Not Ceased.**</u>

Plaintiff asserts its violations have ceased, and thus, no injunctive relief is necessary. This is simply another misrepresentation to this Court.

*First,* Plaintiff agrees it continues to use the name "Smoot" in the construction industry. As discussed above and in the Motion, The Smoot Corporation owns the rights to this name—Plaintiff does not. And Plaintiff was blatant about its misuse prior to the complaint.

*Second,* Plaintiff and Mr. Cain's assertions that it has stopped violative behavior lacks both candor and credibility. For example, while Mr. Cain claims "Smoot D.C. has Ceased Utilizing Any of Counterclaimant's Marks," (MIO, Doc. #16, at PageID: #269, citing Cain Decl. ¶¶ 97-107), this is simply false. *Currently*, Plaintiff is using the Smoot Corporation name and logo *in 5 separate places* in one of the most heavily traffic places in the country – the National Mall:



(Declaration of Jayson Bisogno attached hereto as Exhibit F with photos of all 5 locations). And in another Section of D.C., the Smoot Corporation name and logo is *currently* used by Plaintiff:

18



(*Id.*). In addition, Mr. Cain's representation that "[Plaintiff] secured and deployed its own logo and mark," and the Counterclaim is about "marks found on shirts and the like," (Cain Decl., Doc. 16-2, PageID: #333), is also false. There are not just "shirts." As show above, public posters throughout D.C. still exist. Further, the registered mark still appears on Plaintiff's vehicles:



(*See* Ex. F). And, contrary to Plaintiff's claims that they have removed all images from their websites, the Smoot Corporation's name and logo are *currently* posted on Plaintiff's LinkedIn:



19

And this is just what the Smoot Corporation has found from open sources, in the limited, pre-discovery period since May 16, 2022.[6]

Mr. Cain assured this Court, *in unequivocal terms*, that Plaintiff was not using *any* of the Registered Marks at issue. This assertion—and others—were patently false. Just taking a walk around Washington, D.C. demonstrates Mr. Cain's lack of candor to this Court. At worst, the use of the Smoot marks and tradename is subject to an implied license which The Smoot Corporation terminated when Plaintiff became its competitor.

## V. **Conclusion.**

For all the foregoing reasons, and those contained in its Motion, The Smoot Corporation respectfully requests the Court grant the TRO and Preliminary Injunction as requested.

    Respectfully submitted,

*/s/Patrick Kasson*
Patrick Kasson (0055570)
Thomas N. Spyker (0098075)
Eric J. Weiss (0073066)
**Reminger Co., L.P.A.**
200 Civic Center Dr., Suite 800
Columbus, Ohio 43215
TEL No.: (614) 228-1311
FAX No.: (614) 232-2410
pkasson@reminger.com
tspyker@reminger.com
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the foregoing was filed using the Court's e-Filing System this 31st day of May, 2022 and that service will be accomplished via the System upon all counsel of record.

*/s/Patrick Kasson*
Patrick Kasson (0055570)

---

[6] LinkedIn image is available at: https://www.linkedin.com/company/smoot-construction-company-of-washington-dc/posts/?feedView=all (last accessed on 5/25/2022 at 10:37 am).