UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Smoot Construction of
Washington, D.C.,

        Plaintiff,

v.

The Smoot Corporation, *et al.*,

        Defendants.

Case No. 2:22-cv-1707

Judge Michael H. Watson

Magistrate Judge Vascura

## OPINION AND ORDER

Smoot Construction of Washington, D.C. ("Plaintiff") filed its Complaint in March. ECF No. 1. Over a month later, The Smoot Corporation and Smoot Construction Company of Ohio filed an Answer, Counterclaim, and a motion for a temporary restraining order ("TRO") and preliminary injunction. ECF Nos. 10, 12. The Court held an informal preliminary conference and ordered the parties to fully brief the motion. For the following reasons, the motion for a TRO is **DENIED**.

### I. BACKGROUND

Defendant[1] alleges the following in its Verified Counterclaim:

---

[1] The Smoot Corporation and the Smoot Construction Company of Ohio are both named defendants in this case. However, for simplicity's sake, the Court refers to The Smoot Corporation as "Defendant." The Smoot Construction Company of Ohio is a wholly owned subsidiary of Defendant "and has a permissive license on the Smoot trade name and the Registered Marks referenced herein." Mot. 1 n.1, ECF No. 12. The Smoot Construction Company of Ohio joins in the motion for a TRO only "to the extent that [it] is independently harmed by the uses and unfair practices described herein." *Id.*

This case arises from a dispute between members of the Smoot family. Because the family members are so intertwined with the issues, the following lineage is important:



Countercl. ¶¶ 7–9, ECF No. 10;[2] Cain Decl. ¶ 5, ECF No. 16-2.

Sherman Smoot founded Defendant in 1946. Countercl. ¶¶ 4, 6 ECF No. 10. Lewis R. Smoot, Sr. ("Lewis Sr.") is Defendant's past President and current Chairman. *Id.* ¶¶ 7, 89. Lewis R. Smoot, Jr. ("Lewis Jr.") is Defendant's current President and CEO. *Id.* ¶ 8. Mark Sherman Cain ("Cain") is the current President and CEO of Plaintiff. *Id.* ¶ 9.

Before the instant suit arose, Cain served as *Defendant's* President from 2010–2020. *Id.* ¶ 15. A breakdown occurred between the Smoot family members, at which point Cain became Co-President alongside his cousin, Lewis Jr. *Id.* ¶¶ 16, 101. Upon the creation of the Co-Presidency for the cousins, the

---

[2] Defendant's statement of facts regularly cites to the Verified Counterclaim. *See* Mot. 4–11, ECF No. 12. However, the citations themselves are incorrect. Defendant should check any future filings for accuracy; the Court will strike future filings with similar errors.

relationship between Cain and Defendant further deteriorated. *Id.* ¶¶ 99–100, 102. Cain was then removed from the Co-Presidency, and Lewis Jr. became Defendant's Chairman of the Board, CEO, and President. *Id.* ¶ 103. Three days after Lewis Jr.'s promotion, Cain was fired. *Id.* ¶ 106. But Cain's firing did not leave him without work, because Cain is Plaintiff's majority owner.

By way of background, Defendant originally ran D.C. operations from 1964–1984, until Plaintiff was founded as a wholly owned subsidiary of Defendant in 1984. *Id.* ¶¶ 35–37. Plaintiff remained a wholly owned subsidiary of Defendant until 2005, when Cain became the majority owner. *Id.* ¶¶ 41–45. Even after the ownership change, Cain regularly reported to Defendant's Board of Directors about Plaintiff's operations, and the companies "shared common bonding, insurance, and other programs which allowed Plaintiff to enjoy a lower overhead cost and have access to large[r] projects than it otherwise would have." *Id.* ¶¶ 54, 57. According to Defendant, the parties also had various (apparently oral) "understandings"—"it was understood that Plaintiff would continue to operate for the collective benefit of [Defendant]" and "that Plaintiff would never be operated in a manner to compete with [Defendant]." *Id.* ¶¶ 59–60. Plaintiff and Defendant also, apparently, had an understanding regarding Plaintiff's use of Defendant's "protected trade name and Registered Marks": "the scope of the permissible use was . . . only extended to non-competitive use while the companies shared common interests." *Id.* ¶¶ 67–81.

In addition to the alleged oral understandings, the parties executed a written agreement regarding Administrative Services (the "ASA") that Defendant would provide Plaintiff. *Id.* ¶ 83. But, according to Defendant, that agreement "does not reflect all of the interrelated operations between Plaintiff and [Defendant]." *Id.* ¶ 84.

Defendant makes numerous further allegations about Plaintiff—or, more specifically, about Cain. However, as many of those allegations are unrelated to the legal arguments that Defendant makes, the Court will not repeat them here.

## II. STANDARD OF REVIEW

The United States Court of Appeals for the Sixth Circuit has recognized that the purpose of a TRO "is to preserve the status quo so that a reasoned resolution of a dispute may be had." *Procter & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996). When considering whether to issue a TRO, a Court considers four factors:

> (1) whether the movant has a strong likelihood of success on the merits, (2) whether the movant would suffer irreparable injury absent a stay, (3) whether granting the stay would cause substantial harm to others, and (4) whether the public interest would be served by granting the stay.

*Ohio Democratic Party v. Donald J. Trump for President, Inc.*, No. 16-4268, 2016 WL 6608962, at *1 (6th Cir. Nov. 6, 2016) (internal citations omitted). "These factors are not prerequisites that must be met, but are interrelated considerations that must be balanced together." *Stein v. Thomas*, 672 F. App'x 565, 569 (6th Cir. 2016) (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*,

945 F.2d 150, 153 (6th Cir. 1991)). "[P]reliminary injunctions are extraordinary and drastic remed[ies] . . . never awarded as of right." *Platt v. Bd. of Comm'rs on Grievances and Discipline of Ohio Supreme Court*, 769 F.3d 447, 453 (6th Cir. 2014) (internal quotation marks and citation omitted); *see also ABX Air, Inc. v. Int'l Bhd. of Teamsters, Airline Div.*, 219 F. Supp. 3d 665, 669–70 (S.D. Ohio 2016) (explaining that the TRO and preliminary injunction standards are "logically the same").

When a party seeks a TRO that does not simply preserve the status quo, but rather is "tantamount to a mandatory injunction," there is a "higher—yet undefined—burden" on the party seeking the TRO. *Shelby Cnty. Advocs. for Valid Elections v. Hargett*, 348 F. Supp. 3d 764, 768–69 (W.D. Tenn. 2018) (citing *Hill v. Snyder*, No. 16-2003, 2016 WL 4046827, at *2 (6th Cir. July 20, 2016); *Ne. Ohio Coalition for Homeless & Serv. Emps. Int'l Union, Local 1199 v. Blackwell*, 467 F.3d 999, 1006 (6th Cir. 2006)).

### III.   ANALYSIS

Defendant alleges that Plaintiff is violating the Lanham Act.[3] *See generally* Mot., ECF No. 12. As a result of that violation, Defendant seeks a preliminary injunction and TRO that requires Plaintiff to:

---

[3] In its Reply, Defendant alleges, in the alternative to the Lanham Act claim, that Plaintiff is in breach of the ASA. Reply 3, ECF No. 18. It also mentions for the first time in its Reply a deceptive trade practices claim. *Id.* A party normally waives an argument by bringing it for the first time in a reply brief. *Cole v. JP Morgan Chase Bank, N.A.*, No. 2:15-CV-2634, 2018 WL 7107927, at *13 (S.D. Ohio Jan. 8, 2018). And even if the Court wanted to consider these arguments, Defendant has failed to brief them, even in the Reply.

> 1. Cease using the "Smoot" name in connection with any business, marketing, construction, building, or general contracting purposes.
>
> 2. Cease using the domain name smootcons[t]ructiondc.com and remove all current content displayed on that website from public access.
>
> 3. Return control of the domain name smootcons[t]ructiondc.com to The Smoot Corporation.
>
> 4. Cease using [Defendant]'s Registered Marks, trade name, or trade dress in any fashion. (See Verified Complaint Ex. C; E).
>
> 5. Cease the circulation of photos, video and media containing any depiction of or reference to: [Defendant], its founders, employees, former employees, corporate history, and projects completed by [Defendant].
>
> 6. Cease using [Defendant]'s proprietary bidding software.
>
> 7. Cease making false claims and misleading statements about Plaintiff's own corporate history and make-up, experience in the construction trades and related industries, and geographical regions in which it operates.

Mot. 1–2, ECF No. 12.

To establish a likelihood of success on the merits for their claim, Defendant must "show more than a mere possibility of success." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir.1997) (internal citations omitted). Defendant asserts that it is likely to succeed on the merits of its Lanham Act claim and on several of its requested forms of relief. Mot., ECF No. 12.

As an initial matter, Defendant did not clearly link each type of requested relief to a specific claim. In any event, it seems that most of the relief sought relates to alleged trademark infringement. Accordingly, the Court will first

examine Defendant's likelihood of success on its Lanham Act claim and will then briefly discuss the appropriateness of the other remedies sought.

### A. Lanham Act

The Lanham Act provides that:

(1) Any person who shall, without the consent of the registrant--

> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; or
>
> (b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive,

shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C.A. § 1114.[4] In accordance with this provision, to prevail on a claim, the moving party "must prove that: (1) the [movant] owns the registered trademark; (2) the [infringer] used the mark in commerce without the [movant's] consent; and (3) the use was likely to cause confusion." *Nagler v. Garcia*, 370 F. App'x 678,

---

[4] Defendant also has a trademark claim under Ohio law, but neither party addresses the same. Nonetheless, "'trademark claims under Ohio law follow the same analysis' that courts employ when considering analogous federal claims." *Allard Enters., Inc. v. Advanced Programming Res., Inc.*, 146 F.3d 350, 354–55 (6th Cir. 1998) (citing *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 754 (6th Cir.1998)).

680 (6th Cir. 2010) (citing *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009)).

Defendant cannot show that it is likely to succeed on the merits because it is not clear who owns the "Smoot" mark. Defendant registered the character mark "Smoot" for "commercial building general contractor; commercial building construction." Countercl. Ex. C., ECF No. 10-3.[5] Federal registration serves as "prima facie evidence of the validity of the registered mark and of the registration of the mark, of the owner's ownership of the mark, and of the owner's exclusive right to use the registered mark in commerce on or in connection with the goods or services specified in the certificate, subject to any conditions or limitations stated in the certificate." 15 U.S.C. § 1057(b). This certainly weighs in Defendant's favor.

But Plaintiff disputes Defendant's ownership and argues instead that "[e]ach company jointly owns the mark." Resp. 8, ECF No. 16 (citing Cain Decl. ¶ 38, ECF No. 16-2). Cain's understanding is that when Plaintiff became individually held, and a majority of its shares were sold to him, the sale included "all the assets, including the company's goodwill and the right to use the 'Smoot'

---

[5] Defendant also has a design mark registered under trademark 4,829,888 ("'888 Mark"). Mot. 10–11, ECF No. 12; *see also* Counterclaim ¶¶ 21–27, ECF No. 10. The same issues arise for both. But Plaintiff has attempted to cease use of the '888 Mark. Resp. 32–33, ECF No. 16. Despite this attempt, Defendant notes that Plaintiff still uses the '888 mark in a few places: some company trucks, public posters, and apparently, one LinkedIn post. Reply 18–19, ECF No. 18. Because of Plaintiff's willingness to cease use of the '888 mark, the Court is confident that the parties can reach a standstill agreement relating to the same.

name." Resp. 20, ECF No. 16 (citing Cain Decl. ¶ 34, ECF No. 16-2). This is not an unreasonable assumption. *See First Fashion USA, Inc. v. Best Hair Replacement Mfrs., Inc.*, 645 F. Supp. 2d 1158, 1164 (S.D. Fla. 2009) ("The law presumes that when a business is conveyed, its trade name and good will are also conveyed."); *see also Brinkman v. Beaulieu of Am., Inc.*, No. CIV.A. SA-02-CA-268, 2002 WL 32097534, at *5 (W.D. Tex. Oct. 29, 2002), *aff'd sub nom.* 67 F. App'x 243 (5th Cir. 2003); *Am. Sleek Craft, Inc. v. Nescher*, 131 B.R. 991, 998 (D. Ariz. 1991); *Dovenmuehle v. Gilldorn Mortgage Midwest Corp.*, 670 F. Supp. 795, 798 (N.D.Ill.1987), *aff'd*,871 F.2d 697 (7th Cir. 1989) ("Unless there is evidence to the contrary, a trade name will be presumed to have passed, even in the absence of formal assignment, to one to whom the business has been transferred." ).

Moreover, regardless of ownership, Defendant may have consented to Plaintiff's use of its mark, and consent is an affirmative defense. *See* 15 U.S.C. § 1114. It is undisputed that the parties had, at least at one time, a written contract: the ASA. Further, the ASA contains at least some language that suggests Plaintiff had consent to use the mark:

> Marketing. Both parties agree that construction services shall be jointly marketed under the name "Smoot Construction" or equivalent so as to present a common and comprehensive list of qualified services and capabilities to the construction industry.

Countercl. Ex. A, ECF No. 10-1. What is disputed, is whether the ASA has expired, *compare* Complaint ¶ 11, ECF No. 1 *with* Answer ¶ 11, ECF No. 10, and

whether the ASA encompassed the entire agreement between the parties, Countercl. ¶ 84, ECF No. 10.

If the parties' various oral "understandings" are part of the ASA, Plaintiff could have been an implied licensee and, by extension, could be unlawfully using Defendant's mark, which seems to be Defendant's theory. *See generally* Mot., ECF No. 12. On the other hand, if the oral understandings are not part of the ASA, then their relationship is governed by only the ASA, which has some language that seems to suggest Plaintiff has the right to use the "Smoot" mark.

Either option is a problem for Defendant. Start with option one: incorporating the oral "understandings" into the parties' agreement. To incorporate those understandings, the Court would have to consider evidence outside the four corners of the ASA. That will be difficult here, because the parol evidence rule provides that "extrinsic or parol evidence which tends to contradict, vary, add to, or subtract from the terms of a written contract must be excluded." *Segal Wholesale, Inc. v. United Drug Serv.*, 933 A.2d 780, 783 (D.C. 2007).[6] Even assuming the parties had properly briefed such an issue (which they did not), and the Court were to make such a finding (which it does not at this stage), in order to actually determine what the ASA encompassed, the Court would need to make factual findings. *Id.* Such inquiries are inappropriate, if not impossible,

---

[6] The Court assumes for the purposes of this Order that the ASA is governed by the law of the District of Columbia, pursuant to the parties' agreement of the same. Countercl. Ex. A, ECF No. 10-1.

without an evidentiary hearing. Therefore, they are better left until after a preliminary injunction hearing.

Next, consider option two: Plaintiff's use of the mark is governed solely by the ASA. That option is also problematic, because certain language in the ASA could be read as consenting to Plaintiff's use of the marks. At this stage, the Court is ill-equipped to fully analyze what the ASA did or did not require the parties to do. At bottom, Defendant has not established a likelihood of success on the merits for a breach of contract claim *or* a Lanham Act claim.

**B.    Domain Name Content and Control**

Defendant does not provide support for its website-related requests for injunctive relief. For example, Defendant provides no legal justification for Plaintiff to return control of the "smootcons[t]ructiondc.com" website to Defendant. Defendant also requests that Plaintiff be ordered to cease using the domain name and remove all current content on the page. If the issue is with the "Smoot" character mark being part of the web address, or the *prior* use of the registered marks on the webpage, for the reasons discussed in detail above, Defendant has not established a likelihood of success on the merits for these claims. If the issue relates to Defendant's Counterclaim for a violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C. § 1125(d) or a trade dress argument, Defendant failed to brief the same, and, so, the Court is not in a position to evaluate the merits at this stage. *See* Countercl. ¶ 214, ECF No. 10; *see also* Resp. 30–32, ECF No. 16.

### C. Proprietary Bidding Software

Defendant also moves the Court to order Plaintiff to "[c]ease using [Defendant's] proprietary bidding software." Mot. 2, ECF No. 12. In response, Plaintiff points to Cain's declaration, where he attests that: "I am not aware of any copyright registration made, or exclusive license held by, The Smoot Corporation in the unnamed software. To the contrary, the subject software was prepared by independent contractors, namely Bill Meck, and he asserts ownership of the software either individually or through a company." Cain Decl. ¶¶ 116–17, ECF No. 16-2. But this is incorrect—Bill Meck attests that he does *not* own the software. See generally Meck Decl., ECF No.18-4. Instead, Meck says that, to his knowledge, Defendant owns the software. *Id.* ¶ 7. And Meck makes clear that he has "never, to Mr. Cain, or anyone, asserted an ownership interest in the software." *Id.* ¶ 11.

But "the Counterclaim is devoid of any claim for copyright infringement or misappropriation, or any other theory pertaining to protecting alleged rights in software, and [Defendant's] Memorandum in Support fails to make any attempt to establish any rights in software." Resp. 26, ECF No. 16. Because it is unclear under what theory Defendant seeks to have the software returned, the Court cannot make a merits determination at this stage.

As Defendant has established "little likelihood" of success on the merits of the briefed claim, the Court need not address the other three factors for a TRO. *Ohio Republican Party v. Brunner*, 543 F.3d 357, 362 (6th Cir. 2008) (citing

*Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001), *cert. denied*, 534 U.S. 951 (2001)).

## IV. CONCLUSION

For the reasons stated above, the Court **DENIES** Defendant's motion for a TRO. A hearing on the preliminary injunction will take place **at 10:00 a.m. on January 3, 2023.**

The parties are also on **NOTICE** that the Undersigned's docket and courtroom are not a proper venue for further personal attacks among these disgruntled family members. All future arguments must relate to legal claims, not unrelated personal frustrations.

**IT IS SO ORDERED.**

*/s/ Michael H. Watson*
**MICHAEL H. WATSON, JUDGE
UNITED STATES DISTRICT COURT**